RECEIVED
JUL 27 2026
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

Civil Action No. 3:26-cv-213-JDM-RP

NATALIA J. NORWOOD,
*Plaintiff,*

**JURY TRIAL DEMANDED**

v.

THE UNIVERSITY OF MISSISSIPPI;
KIMBERLY M. DeVRIES, individually and in her official capacity;
BRADLEY A. SALTERS, in his official capacity only;
NOEL E. WILKIN, Ph.D., in his official capacity only;
GLENN BOYCE, Ed.D., Chancellor of the University of Mississippi, in his official capacity only,

*Defendants.*

# COMPLAINT

Plaintiff Natalia J. Norwood, appearing pro se, alleges as follows.

## I. NATURE OF THE ACTION

**1.** This is an employment and civil-rights action arising from the University of Mississippi's alleged response to Plaintiff's opposition to race- and sex-based disparities; reports of sexual harassment and racially hostile conduct; requests for disability-related accommodation and reassignment; and participation in internal and external civil-rights processes.

**2.** Plaintiff is a Black Latina woman of Puerto Rican national origin, and a Juris Doctor from Charleston School of Law. At relevant times, she served the University as a civil-rights investigator and ADA Specialist in the Office of Equal Opportunity and Regulatory Compliance ("EORC") and, separately, as an adjunct instructor in Legal Studies. The University's October 23, 2025 Summary of Findings acknowledged Plaintiff's strong performance and stated that she was assigned complex investigations because she was "good at [her] job." **(October 23, 2025 Summary of Findings, in Plaintiff's possession.)** Plaintiff's race,

sex, and national origin are relevant background to the disparate-treatment and hostile-work-environment claims asserted below.

**3.** After Plaintiff reported sexual harassment by her supervisor, Billy Benson, Jr.; reported differential treatment by Executive Director Kimberly M. DeVries; requested disability-related accommodation and reassignment; and filed a formal complaint that the University processed under its Title IX framework, the University allegedly took or maintained the actions summarized below.

**4.** Plaintiff alleges that, after receiving medical documentation and a request for transfer or reassignment, the University conditioned consideration of further accommodation or role transition on completion of an investigation whose timing the University controlled. Plaintiff further alleges that the University did not timely decide the requested reassignment on its merits or provide a defined return-to-work plan.

**5.** Plaintiff further alleges that, on or about October 22, 2025, the University converted her request for non-punitive administrative leave with pay into restrictive paid administrative leave that included campus exclusion, loss of University email and systems access, barriers to evidence access, loss of adjunct teaching opportunities and income, and no defined return-to-work plan. Plaintiff alleges that Benson and DeVries remained employed with ordinary work access during the relevant period.

**6.** Plaintiff also alleges that the University issued an October 23, 2025 Summary of Findings signed by Chief Human Resources Officer Bradley A. Salters. The Summary addressed eighteen allegations, including Allegation 13 concerning Human Resources' handling of Plaintiff's accommodation and reassignment request. Plaintiff alleges that Salters participated in the challenged accommodation process and then signed a Summary resolving Allegation 13 as "not substantiated."

**7.** Plaintiff further alleges that, after she gave Provost Noel E. Wilkin written notice on January 23, 2026, that OCR had assigned an attorney to her complaint, two pending appeals were denied the following day. The appeals had remained unresolved for weeks or months before that notice. The delivered PDF files for the two denials bear January 24, 2026 creation timestamps approximately forty-three seconds apart. Plaintiff alleges the timing, sequence, and surrounding circumstances as circumstantial evidence of retaliation and pretext; she does not allege as an established fact that either decision was backdated.

**8.** Plaintiff seeks relief against the University under Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act of 1973 , as further specified in the Counts below. Plaintiff seeks damages from Defendant DeVries only in her individual capacity under the Equal Protection Clause through 42 U.S.C. § 1983. Plaintiff **does not** assert in this Complaint a claim against GRS, an Equal Pay Act claim, an ADA Title I damages claim against the University, a Mississippi Tort Claims Act claim, a Mississippi Public Records Act claim, or a freestanding procedural-due-process claim.

**9.** As to the University's liability under Section 504 of the Rehabilitation Act, Plaintiff seeks economic damages and other remedies legally available, consistent with the Spending Clause limitations described in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022).

**10.** Grand River Solutions, Inc. ("GRS") is not named as a defendant. Its alleged conduct is included as factual background and as evidence relevant to the University's alleged notice, intent, pretext, and response to Plaintiff's complaints. Plaintiff asserts no independent cause of action against GRS in this Complaint.

**11.** Plaintiff **does not** assert a freestanding claim based solely on an allegedly unfair internal investigation, denial of an investigative file, an authorship conflict, or the timing of the January 2026 appeal decisions. Plaintiff alleges those matters as facts relevant to discriminatory intent, retaliatory motive, pretext, unequal treatment, and the adequacy of the University's response under the claims separately pleaded below.

**12.** Plaintiff seeks damages and equitable relief only to the extent legally available under each asserted cause of action. Plaintiff does not seek emotional-distress damages or punitive damages under the Spending Clause claims asserted under Title IX or Section 504.

## II. JURISDICTION AND VENUE

**13.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 U.S.C. § 1983. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) - (4) over Plaintiff's claims to redress, under color of state law, the deprivation of rights secured by the Constitution and by Acts of Congress providing for equal rights.

**14.** Venue is proper in the Northern District of Mississippi under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, principally in Lafayette County, Mississippi. Assignment to the Oxford Division is proper under this Court's Local Rules.

## III. PARTIES

**15.** Plaintiff Natalia J. Norwood is an adult resident of Tuscaloosa County, Alabama, residing at 9401 Crete Circle, Tuscaloosa, Alabama 35406. She holds a Juris Doctor. At all relevant times she has been an employee of the University of Mississippi. As of the filing of this Complaint she remains a University employee on restrictive paid administrative leave in the position of Compliance Associate I, Compensation Grade 7, with a base salary of approximately $77,289.14 annually effective July 1, 2026.

**16.** Defendant University of Mississippi ('UM' or 'the University') is a public institution of higher education of the State of Mississippi located in Oxford, Lafayette County, Mississippi. UM is an 'employer' within the meaning of Title VII, 42 U.S.C. § 2000e(b). UM is, on information and belief, a recipient of federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681, and Section 504, 29 U.S.C. § 794, including federal student-aid and research funding, and has accepted such assistance at all times relevant to this action, and is therefore subject to Title IX and Section 504. Plaintiff seeks relief against UM under Counts I through III (Title VII), Count IV (Title IX), and Counts V through VI (Section 504). Plaintiff **does not** seek damages from UM under 42 U.S.C. § 1983.

**17.** Defendant Kimberly M. DeVries is, on information and belief, the University's Assistant Vice Chancellor for Access and Compliance and Executive Director of EORC and has served as Acting Title IX Coordinator while the regular Title IX Coordinator was unavailable. She holds a Juris Doctor. At all relevant times she acted under color of state law. She was Plaintiff's second-line supervisor and a respondent in related internal matters. She is sued in her individual capacity for damages under Count VII and in her official capacity solely for prospective injunctive relief under Count VIII.

**18.** Defendant Bradley A. Salters is, on information and belief, the University's Chief Human Resources Officer, a position he has held since on or about November 25, 2024. He is sued in his official capacity only, solely for prospective injunctive relief under Count VIII

regarding personnel records, leave posture, systems access, and related employment administration. No individual-capacity damages claim is asserted against Mr. Salters in this Complaint.

**19.** Defendant Noel E. Wilkin, Ph.D., is, on information and belief, the University's Provost and Executive Vice Chancellor for Academic Affairs. He is sued in his official capacity only, solely for prospective injunctive relief under Count VIII regarding appeals, academic personnel actions, and related authority. No individual-capacity damages claim is asserted against Dr. Wilkin in this Complaint.

**20.** Defendant Glenn Boyce, Ed.D., is, on information and belief, the University's Chancellor and chief executive officer. He is sued solely for prospective declaratory and injunctive relief. The Chancellor has authority, directly or through University officials subject to the Chancellor's authority, to implement institutional corrective action, including correction of personnel and investigative records, restoration of employment-related access and opportunities where appropriate, and implementation of lawful procedures. No damages are sought from the Chancellor.

**21.** Grand River Solutions, Inc. ("GRS") is not named as a defendant in this Complaint. GRS is a private California corporation that, on information and belief, contracts with colleges and universities, including the University of Mississippi, to provide outsourced Title IX investigative and compliance-consulting services. GRS was retained by UM to serve as the external investigator in Plaintiff's Title IX matter due to internal conflicts of interest. GRS's conduct in that engagement is alleged herein solely as background and as evidence of the University's intent, pretext, and unequal treatment; no cause of action is asserted against GRS in this Complaint.

**22.** Billy Benson, Jr. is not named as a defendant in this Complaint. His unwelcome sexual conduct is alleged as the predicate harassment that the University and DeVries failed to remediate, for which the University is liable as employer under Title VII.

**23.** The Board of Trustees of State Institutions of Higher Learning ("IHL Board") is not named as a monetary defendant.

## IV. ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

**24.** All conditions precedent to the claims asserted in this Complaint have been satisfied, waived, are inapplicable, or are otherwise excused by law.

**25.** Plaintiff timely filed EEOC Charge No. 490-2026-00516 on or about April 23, 2026, alleging discrimination based on disability, race, retaliation, and sex. The EEOC issued a Notice of Right to Sue as to that charge on or about April 29, 2026. This action is timely under 42 U.S.C. § 2000e-5(f)(1) because it is filed within ninety days of the Notice's April 29, 2026 issuance date and therefore necessarily within ninety days of Plaintiff's receipt of that Notice. **[EX: EEOC Charge No. 490-2026-00516; EX: EEOC Notice of Right to Sue (Charge 490-2026-00516)].**

**26.** OCR referral as the source of Charge No. 490-2026-02296. Plaintiff filed a complaint with the U.S. Department of Education, Office for Civil Rights ("OCR") on November 8, 2025, OCR Complaint No. 06262017, alleging discrimination on the basis of race or color, sex, and disability, and retaliation, by the University.

**27.** OCR confirmed receipt and requested a signed consent form; Plaintiff executed and returned that consent form on or about November 18, 2025, with a follow-up re-transmission on November 24, 2025.

**28.** On January 21, 2026, OCR confirmed that Attorney Andrew Jorgenson had been assigned to review Plaintiff's complaint.

**29.** On April 29, 2026, OCR issued a letter dismissing Plaintiff's OCR complaint because OCR was referring it to the EEOC for further action under Title VII of the Civil Rights Act of 1964 and Title I of the Americans with Disabilities Act of 1990, pursuant to Section 108(g) of OCR's Case Processing Manual. **[EX: OCR Referral/Dismissal Letter.]**

**30.** The regulatory date-carryover mechanism. OCR's referral letter states: "*While the EEOC will consider the date OCR received your complaint as the date it was received by EEOC, EEOC may require additional information for the complaint to be considered an EEOC charge of discrimination.*" **[EX: OCR Referral/Dismissal Letter (Apr. 29, 2026)]**

**31.** Consistent with 29 C.F.R. § 1691.6(a), a complaint referred to EEOC is deemed a charge received by EEOC, and the date the referring agency received the complaint is deemed the date EEOC received it for Title VII purposes. Plaintiff relies on that regulatory mechanism as to OCR-referred Charge No. 490-2026-02296.

**32.** Charge-processing anchor and distinction from Charge 490-2026-00516. Charge No. 490-2026-02296 resulted from OCR's referral of Plaintiff's November 2025 OCR complaint, not from any independently initiated EEOC charge by Plaintiff. EEOC processed Charge 490-2026-02296 using OCR's November 8, 2025, intake date as the charge-filing date, consistent with the regulatory mechanism described above. This distinguishes Charge 02296 from Charge No. 490-2026-00516, which Plaintiff filed directly with the EEOC on April 23, 2026, and which is governed by its own independent charging period. EEOC's Notice of Right to Sue on Charge 490-2026-02296 states that EEOC was "unlikely to be able to complete its investigation within 180 days from the date the charge was filed." That notice is consistent with EEOC's treatment of OCR's November 8, 2025, intake date as the charge-filing date, notwithstanding that the charge form was signed on May 21, 2026. **[EX: EEOC Notice of Right to Sue, Charge No. 490-2026-02296 (May 21, 2026)].**

**33.** Separately, the EEOC docketed Charge No. 490-2026-02296 from the OCR referral described above, alleging national-origin discrimination based on Plaintiff's Puerto Rican identity. The charge covers conduct from October 10, 2025, through January 9, 2026, including Plaintiff's alleged exclusion from EORC, BERT, and Title VI work. The EEOC issued a Notice of Right to Sue on that charge on May 21, 2026, under 29 C.F.R. § 1601.28(a)(2), signed by District Director Delner Franklin-Thomas, and re-transmitted it by letter dated May 28, 2026. **[EX: EEOC Notice of Right to Sue, Charge No. 490-2026-02296 (May 21, 2026); EX: EEOC Re-Transmittal Cover Letter (Lynda Fier, May 28, 2026)].** As discussed below, Plaintiff does not assert a freestanding national-origin count in this Complaint; this charge is pleaded as part of the administrative record and as background evidence relevant to Counts II and III.

**34.** *How national origin entered the EEOC charge process.* In her April 23, 2026, proposed narrative for Charge No. 490-2026-00516, Plaintiff expressly identified her Puerto Rican/Latina national origin, stating: "I am Puerto Rican, Black, female, and disabled within the meaning of the ADA." **(Email to EEOC Investigator McDowell, in Plaintiff's possession.)**

**35.** EEOC Investigator Vurtis McDowell omitted "national origin" from the final Charge No. 490-2026-00516. When Plaintiff later sought to add national origin to Charge No. 490-2026-02296, EEOC Enforcement Supervisor Lynda Fier advised on May 21, 2026, that race and sex could not be added because "a determination has already been made on those bases," but confirmed that national origin was accepted onto that charge. **(May 21, 2026 email from Lynda**

**Fier, in Plaintiff's possession.)** Plaintiff does not assert a freestanding national-origin count in this Complaint; the exhausted national-origin charge is pleaded here as part of the administrative history and as background evidence of the disparate treatment of women of color, described further in Counts II and III below.

**36.** Separately, on May 21, 2026, the U.S. Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP") closed Plaintiff's complaint, OFCCP Complaint No. I00319936, and deferred the matter to the EEOC under the OFCCP-EEOC Memorandum of Understanding. This OFCCP closure is pleaded as background; Plaintiff asserts no separate claim under the OFCCP framework in this Complaint.

**37.** The Title VII claims in Counts I–III are limited to theories reasonably growing out of the charges identified above:

| **Protected basis / theory** | **Charge coverage** |
|---|---|
| Race discrimination | Charge 490-2026-00516 |
| Sex / sexual harassment | Charge 490-2026-00516 |
| Retaliation | Charge 490-2026-00516 (and continuing acts) |
| Disability / accommodation (as Title VII retaliation context and as cross-referenced) | Charge 490-2026-00516 |
| Hostile work environment | Charge 490-2026-00516 (and related narrative) |
| Relevant charging-period anchors | At least October 22, 2025, through continuing restrictive leave |

**38.** **No EEOC exhaustion required for Counts IV–VIII.** Section 504 claims (Counts V–VI), Title IX claims (Count IV), and Section 1983 claims (Counts VII–VIII) do not require EEOC charge exhaustion as a precondition to suit. Title IX imposes no administrative exhaustion requirement on private suits for damages or injunctive relief. See *Jackson*, 544 U.S. 167.

**39.** **Continuing-violation / hostile-work-environment timeliness.** To the extent any component act of Plaintiff's hostile-work-environment claim occurred outside the applicable EEOC charging period, Plaintiff pleads those acts as component acts of a single unlawful

employment practice. Such acts are timely under the continuing-violation doctrine if at least one act contributing to the hostile environment occurred within the charging period. See *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–18, 122 (2002). Plaintiff alleges timely contributing acts including the October 22, 2025, restrictive package and its continued maintenance; the October 23, 2025 Summary of Findings, and the January 24, 2026, dual appeal denials.

**40.** Earlier related allegations, including comparator pay, advancement, and assignment disparities; failure to remediate reported sexual harassment; exposure to racial epithets; exclusion from EORC investigation work, BERT, and Title VI duties; and exclusion from division and professional-development meetings between May and October 2025, are pleaded as components acts of the alleged hostile environment and as background relevant for intent and pretext. Plaintiff **does not** seek separate recovery for otherwise untimely discrete acts except as permitted by law.

**41.** *Notice under the Mississippi Tort Claims Act.* Plaintiff served a Notice of Claim under the Mississippi Tort Claims Act on or about May 27, 2026, to preserve potential state-law remedies. Plaintiff **does not** assert any MTCA tort counts, or any other Mississippi state-law claims, in this Complaint.

**42.** Public-records remedies. Plaintiff has pursued public-records remedies under the Mississippi Public Records Act, including an appeal denied by the Provost, and Mississippi Ethics Commission Public Records Case No. R-25-070 against the University. The Ethics Commission approved an Order of Dismissal in R-25-070 on July 10, 2026, transmitted under cover letter dated July 15, 2026, and received by Plaintiff on or about July 21, 2026. Plaintiff does not assert a freestanding MPRA or Ethics Commission count in this federal Complaint. Plaintiff has since filed a Petition for *De Novo* Review of the Order in the Chancery Court of Lafayette County, Mississippi under Miss. Code Ann. § 25-61-13.

**43.** **Litigation hold and preservation demand.** On or about May 22, 2026, Plaintiff served a litigation hold and preservation demand to the University covering, among other categories, the November 2025–January 2026 appeal window, authorship and version history of the Summary of Findings, communications concerning Mr. Salters's roles, and leave-implementation records.

**44.** The factual allegations in this Complaint are organized by subject matter and pleaded in support of the specific counts identified below. Plaintiff does not assert a freestanding

cause of action based on any fact recited solely as background, comparator evidence, or circumstantial evidence of pretext unless expressly identified as an element of a specific count.

## V. FACTUAL ALLEGATIONS

*(All facts are alleged on personal knowledge except where otherwise stated on information and belief.)*

### A. Plaintiff's Background and Performance

**45.** Plaintiff states that EEOC Charge No. 490-2026-00516 identifies Plaintiff's employment in EORC beginning September 19, 2022. Plaintiff alleges that the charge's reference to 2024 as a hire year is a clerical error.

**46.** During her University employment, Plaintiff received recognition, including a 2024 nomination for the University's "40 Under 40," Diversity and Excellence awards, an ISOM Gender Studies Faculty Fellowship, selection as moderator for the University's February 2025 panel "Leadership, Mentorship, and Sponsorship: Empowering Women in Higher Ed," and selection as Staff Member of the Month for December 2023, announced by letter dated December 20, 2023 from Chancellor Glenn F. Boyce.

**47.** The University's own October 23, 2025 Summary of Findings acknowledged Plaintiff's "strong performance" and stated she was assigned "complex investigations because [she is] good at [her] job." **( October 23, 2025 Summary of Findings, in Plaintiff's possession.)**

**48.** DeVries's decision-making authority over compensation, assignment, and advancement for the law fellow cohort is confirmed by the University's own October 23, 2025 Summary of Findings, which identifies DeVries as the Assistant Vice Chancellor responsible for these determinations and describes her compensation decisions for the cohort as guided by a stated 'cohort parity' standard.

**49.** Plaintiff's annual base salary was $75,038.00 in late 2025. Effective July 1, 2026, her annual base salary increased to $77,289.14 in the position of Compliance Associate I, Compensation Grade 7.

**50.** Plaintiff pleads Paragraphs 45 through 49 as background establishing her qualifications, performance, and compensation history relevant to the disparate-treatment, retaliation, and hostile-work-environment claims asserted below. Plaintiff does not allege in this section that any adverse action occurred; adverse actions are alleged in the sections that follow.

## B. Comparators and Disparate Treatment in Pay, Advancement, and Assignments

**51.** Plaintiff was hired on September 19, 2022, from the same EORC hiring pool as two white women, Marissa Watson and Jordan Cohen (also known as Jordan Cohen-Climer). Plaintiff, Watson, and Cohen held the same job title and reported within the same EORC supervisory structure during the relevant period, with DeVries as decisionmaker over their compensation, assignments, and advancement. The University's own October 23, 2025 Summary of Findings refers to Plaintiff, Watson, and Cohen collectively as "all three Fellows" and as the "law fellow cohort," and states that their compensation decisions were guided by "cohort parity."

**52.** Plaintiff alleges that, despite holding the same title, reporting to the same decisionmaker, and being part of the same cohort, she was denied compensation, advancement, assignment, and professional-development opportunities afforded to Watson and Cohen.

**53.** DeVries, the decisionmaker responsible for compensation and assignment decisions affecting Plaintiff, Watson, and Cohen, invoked Watson and Cohen by name when denying Plaintiff's requests. When Plaintiff sought a raise after exceeding performance expectations, DeVries stated that granting it "wouldn't be fair to Marissa and Jordan." When Plaintiff requested removal from Benson's supervision after reporting his sexual harassment, DeVries again invoked Watson and Cohen, stating that removing Plaintiff would not be fair to them. Plaintiff alleges that DeVries's reliance on comparison to Watson and Cohen, rather than an individualized assessment of Plaintiff's performance or safety concerns, together with the differential treatment described throughout this section, supports an inference that race and sex affected the treatment Plaintiff received.

**54.** On October 23, 2025, the University issued a Summary of Findings from its investigation into Plaintiff's complaints. The Summary of Findings acknowledged that (a) Plaintiff requested a promotion plan and was told promotions were not allowed; (b) Plaintiff's white colleagues Marissa Watson and Jordan Cohen were assigned to interim leadership roles as Title IX Coordinator and Assistant Director of EORC in December 2024 without a competitive process; (c) Assistant Vice Chancellor DeVries acknowledged these appointments were "not based on merit"; (d) Watson and Cohen were selected for Title IX roles because they were "already doing the job," while Plaintiff — also already performing the duties of the ADA Specialist role — was required to complete a full competitive search including a presentation; and (e) all 18 of Plaintiff's allegations were found unsubstantiated.

**55.** Disparate case assignments and professional-development opportunities. Plaintiff was routinely assigned the office's most emotionally demanding and legally complex investigations, including six simultaneous complaints against high-ranking University employees across multiple departments, without additional support, reduced caseload, or trauma-informed resources. On one assignment, Plaintiff was directed to review over eighty Zoom recordings, each one to two hours in length, without assistance, while simultaneously managing multiple active discrimination investigations. Comparators Watson and Cohen, by contrast, were assigned more visible, career-enhancing policy work and lower-complexity casework and were later placed in interim leadership roles without competitive process. Plaintiff alleges that this disparity in assignment load and professional-development opportunity was motivated by race and sex and evidences the University's pattern of channeling burdensome labor to Plaintiff while extending career advantages to her white colleagues, as alleged above.

**56.** On or about October 23, 2023, DeVries assigned Plaintiff to investigate a discrimination and retaliation complaint brought by a Venezuelan-national staff member, formally transmitting their contact information to Plaintiff that day. **(October 23, 2023 DeVries Email Forwarding Contact Information, in Plaintiff's possession.)** Plaintiff alleges that, that same day, DeVries told Plaintiff in person that she was assigning the matter to Plaintiff because Plaintiff was "a woman of color too." Plaintiff further alleges that, on or about October 31, 2023, during Plaintiff's initial meeting with the complainant, the complainant independently told Plaintiff that DeVries had told her, separately, that DeVries was going to give her case to a woman of color. Plaintiff alleges that DeVries's repetition of this stated rationale to two separate individuals corroborates that DeVries used Plaintiff's race and national origin as an assignment criterion, rather than assigning cases on a race-neutral basis.

**57.** In December 2023, Plaintiff proposed that the University adopt operative definitions of discrimination in UM Policy ACA.EO.100.005 and offered to assist with revising the policy. DeVries agreed that the existing policy allowed substantial case-by-case discretion but declined Plaintiff's offer and assigned the policy-revision work to another employee instead. Plaintiff alleges that, despite her experience handling Title VI, Title VII, and ADA matters in EORC, DeVries denied her this professional-development opportunity while continuing to assign

her a disproportionate volume of complex and volatile investigations, consistent with the pattern described above.

**58.** Plaintiff pleads Paragraphs 45 through 57 as direct evidence of disparate treatment in compensation, assignments, and advancement based on race and sex, and as comparator evidence supporting the discrimination and retaliation claims asserted below.

**C. Sexual Harassment by Supervisor Benson and DeVries's Failure to Protect**

**59.** Beginning in or about May 2024, Plaintiff reported to DeVries that Benson had subjected her to unwelcome sexual conduct, including unwanted slapping of her buttocks, access to private photographs on her phone, and explicit sexual statements. Plaintiff requested reassignment so that she would not remain under Benson's supervision.

**60.** On multiple occasions, Plaintiff told Benson to stop, stated that his conduct was inappropriate, and told him that University policies applied. Plaintiff alleges that Benson's physical touching, access to private photographs, and explicit sexual statements were unwelcome.

**61.** On the day Plaintiff reported Benson's conduct, DeVries instructed Plaintiff not to report Benson to the then-Title IX Coordinator, Honey Ussery, and told Plaintiff to *"think about Billy,"* referring to Benson's new baby and a non-working wife, and stated that removing Plaintiff from Benson's supervision *"would not be fair to Marissa or Jordan."*

**62.** After Plaintiff reported Benson's conduct and requested reassignment, DeVries told Plaintiff, in substance, that she could not simply remove Benson's supervisory duties or move Plaintiff out of Benson's reporting line without addressing the matter through a formal process. DeVries stated that, if Plaintiff made a formal report to DeVries, DeVries could take action. Plaintiff understood that process to involve confronting Benson with the allegations and potentially imposing consequences on him.

**63.** Plaintiff did not seek to punish Benson; she sought a safe reassignment that would allow her to continue working without reporting directly to Benson. Plaintiff asked to return to reporting to DeVries, which would have allowed Plaintiff to address her concerns and workplace boundaries without Benson retaining supervisory authority over her. Plaintiff understood from DeVries's statements that a reassignment or removal of Benson's supervisory authority would be

treated as punitive action against him rather than as a non-punitive protective measure for Plaintiff.

**64.** Plaintiff was afraid to initiate a formal complaint at that time. She reasonably feared retaliation based on the treatment she had observed toward other women of color who raised workplace concerns, her concern that Benson would retaliate if he learned of her allegations, and DeVries's response to Plaintiff's request for protection. When Plaintiff told DeVries that Benson sometimes retaliated when Plaintiff avoided him, DeVries responded, in substance, that this was difficult to believe because Benson was *"very protective"* of Plaintiff.

**65.** Plaintiff therefore did not pursue a formal complaint at that time and remained under Benson's supervision for nearly one year after her initial report. Plaintiff alleges that DeVries's response left her to choose between initiating a process that she reasonably believed would expose her to Benson's retaliation or continuing to report to the supervisor whose conduct she had reported.

**66.** Under the University's Title IX framework, supportive measures are available upon notice of sexual harassment regardless of whether a formal complaint is filed. Plaintiff alleges that the University did not offer a non-punitive reassignment or other effective protective measure that would have permitted her to work safely without reporting to Benson. Plaintiff alleges that the University's failure to offer available supportive measures is consistent with the broader pattern of differential treatment alleged throughout this Complaint.

**67.** On May 14, 2024, after DeVries overheard Benson raise his voice at Plaintiff in the office during work hours, DeVries wrote that she was "*hesitant*" about what to tell Benson and "*hesitant*" about how to act. Plaintiff alleges that this written statement, considered with her prior report, supports an inference that DeVries had notice of the situation and did not take adequate protective action. **(Text Message from DeVries Stating Hesitancy, in Plaintiff's possession.)**

**68.** On or about February 14, 2025, DeVries publicly *joked* to Benson, *"Watch out Billy, she's going to report you for sexual harassment!"* At that time, Plaintiff had reported to DeVries that Benson was sexually harassing her.

**69.** In or about March 2025, Plaintiff reported concerns regarding Benson's conduct and DeVries's response to senior University leadership, including the Vice Chancellor for Student Affairs and the Vice Chancellor for Access, Opportunity, and Community Engagement. Plaintiff's report included her concerns regarding Benson's alleged sexual harassment and

DeVries's failure to provide requested protective measures after receiving notice of that conduct. **(March 2025 Report to Senior University Leadership, in Plaintiff's possession.)**

**70.** The Vice Chancellor for Access, Opportunity, and Community Engagement promptly escalated Plaintiff's concerns to Provost Noel Wilkin. Provost Wilkin then involved the Office of General Counsel and the University's Chief Human Resources Officer.

**71.** The University's engagement with Grand River Solutions ("GRS") was executed on or about May 7, 2025. GRS did not contact Plaintiff concerning these matters until approximately June 2025.

**72.** Plaintiff alleges that her formal concerns regarding Benson and DeVries were not resolved promptly. As of the filing of this Complaint, the investigation concerning Benson remained incomplete. Plaintiff's complaint concerning DeVries was treated as a separate matter, which the University represented would be addressed later under its nondiscrimination and sexual-harassment policy. Plaintiff alleges that the University placed DeVries in a temporary Title IX role while DeVries was a respondent in Plaintiff's unresolved complaint and had prior direct involvement in Plaintiff's report concerning Benson.

**73.** **Complainant–respondent access: Benson.** At all times relevant to Plaintiff's October 22, 2025 restrictive leave, Benson remained employed in his Director and ADA Coordinator role. On information and belief, Benson retained campus access, University email and systems access, and the ability to perform his job duties. On information and belief, Benson was not placed on restrictive administrative leave, excluded from campus, or locked out of University systems in connection with Plaintiff's formal sexual-harassment complaint. Plaintiff alleges that the University restricted her, the complainant requesting protective measures, while leaving Benson, the respondent, with ordinary work access.

**74.** **Complainant–respondent access: DeVries.** At all times relevant to Plaintiff's October 22, 2025 restrictive leave, DeVries remained employed in her Executive Director and Assistant Vice Chancellor roles. On information and belief, DeVries retained campus access, University email and systems access, and the ability to perform her job duties. On information and belief, DeVries was not placed on restrictive administrative leave, excluded from campus, or locked out of University systems in connection with Plaintiff's formal sexual-harassment complaint. Plaintiff alleges that the University restricted her, the complainant seeking protection and accommodation, while leaving DeVries, a respondent in Plaintiff's internal matters, with ordinary work access.

## D. Other Differential Supervision, Disability, and Sex-Based Treatment

75. Demeanor monitoring. On March 19, 2023, Plaintiff notified DeVries by text message that she had been prescribed medication for postpartum depression and had scheduled an emergency OB appointment. [( **Text to DeVries re PPD Diagnosis and OB Appointment (Mar. 19, 2023) in Plaintiff's possession.)** On or about March 24, 2023, five days later, DeVries told Plaintiff, in substance, that she needed to smile and appear as though she was not troubled by anything while at work, and criticized Plaintiff for seeming as though she no longer enjoyed working there. Plaintiff reported this conversation to her husband by text message that same day. **( Text to Husband re DeVries Demeanor Comments (Mar. 24, 2023) in Plaintiff's possession.)** Plaintiff pleads this conduct as evidence relevant to disability-based hostility, differential treatment, and the alleged failure of the interactive process.

76. **Lactation-space issue.** In or about March 2023, DeVries proposed relocating Plaintiff's lactation or pumping space to a furniture-storage area accessible to Facilities Management personnel and male custodial staff, rather than providing a private, sanitary, and secure space. Plaintiff pleads this allegation as evidence of sex-based differential treatment and hostile work environment.

77. **Office-relocation proposal.** In or about March 2023, DeVries proposed moving Plaintiff from her office so that Jordan Cohen-Climer could use it. Plaintiff agreed to move. Benson later persuaded DeVries not to move Plaintiff and instead to relocate the Title IX office across the building.

78. **Benson's statement regarding differential treatment.** Around February 18, 2025, Benson told Plaintiff that he believed DeVries was treating Plaintiff unfairly relative to her direct comparators and that he had communicated that concern to DeVries. Plaintiff possesses a contemporaneous recording in which Benson states, in substance, that he told DeVries he believed she was treating Plaintiff unfairly. Plaintiff will produce the recording in discovery, subject to an appropriate protective order if required. Plaintiff offers Benson's statement as a contemporaneous statement by her direct supervisor bearing on DeVries's treatment of Plaintiff and notice within the reporting chain.

79. **Escort directive.** On March 25, 2025, DeVries required a white male EORC investigator to accompany Plaintiff while she interviewed a white male witness or respondent.

Plaintiff alleges that DeVries did not impose a comparable accompaniment requirement on white investigators conducting comparable interviews with Black women. Plaintiff pleads this directive as evidence of race- and sex-based differential treatment, racially hostile work environment, and intentional unequal treatment.

## E. Two-Tier Pattern: Favored Respondent Findings, Softened Plaintiff's Claims, and Conflicted Review

**80.** The University's civil-rights process, as experienced by Plaintiff, operated on a two-tier pattern. This pattern is offered as evidence of intentional discrimination, pretext, and unequal treatment, not as a freestanding cause of action.

**81.** In or about April 20, 2023, Plaintiff opened an investigation into a race-discrimination complaint by a student ("Student A") against a white male employee in Fire Protection Services within Facilities Management ("Employee A").

**82.** Plaintiff drafted findings concluding, by a preponderance of the evidence, that Employee A's conduct violated the University's Non-Discrimination and Sexual Harassment Policy. A draft dated on or about November 17, 2023 (and reflected in a file titled with DeVries edits on or about December 6, 2023) found sufficient evidence of a policy violation and recommended written feedback that Employee A's actions violated University policy. **(Employee A draft findings (Nov. 17, 2023) in Plaintiff's possession.)**

**83.** After Facilities Management learned of the draft findings, Facilities Management leadership raised objections and demanded a meeting. On or about December 20, 2023, EORC (including DeVries and Plaintiff), Human Resources, General Counsel (David Whitcomb), and Facilities Management leadership met under the topic "Discuss investigation concerns."

**84.** After that meeting and after further editing, DeVries directed Plaintiff to rewrite the findings of her investigation into Employee A's conduct from "Responsible" to a finding of "Not Responsible." DeVries stated, in substance, that she was "*not willing to die on this hill.*" DeVries requested that Plaintiff create another version, dated on or about February 5, 2024, concluding that there was "*insufficient evidence*" that Employee A's conduct violated the Non-Discrimination Policy, the stated rationale for the "Not Responsible" finding, and dropping the recommendation that Facilities Management require Employee A to attend diversity-sensitivity training. **(Email re: Employee A revised findings (Feb. 5, 2024) in Plaintiff's possession.)**

**85.** On February 15, 2024, DeVries wrote to Whitcomb and Plaintiff, confirming that she and Plaintiff had gone through the Employee A report again and that, after discussion, the

rationale focused more on conflict of evidence and insufficient evidence of different treatment. ( **DeVries email re Employee A report (Feb. 15, 2024) in Plaintiff's possession.)**

**86.** On March 7, 2024, Plaintiff transmitted the revised report to Facilities Management and HR leadership, with DeVries copied. Facilities Management leadership thanked EORC for its "*willingness to listen to our concerns regarding the original report*" and for reconsidering the evidence. **(Facilities Management Thank-You Email (Mar. 7, 2024) in Plaintiff's possession.)**

**87.** A second investigation followed the same pattern. In April 2024, Plaintiff was assigned a case ('Investigation Two') involving three Black complainants who raised concerns about their White female supervisor ('Supervisor B'), a senior administrator overseeing a University administrative department. Plaintiff's investigation found Supervisor B responsible for discrimination against three complainants and retaliation against two complainants by a preponderance of the evidence, and Plaintiff recommended termination from her supervisory role, plus referral to Human Resources for potential FMLA noncompliance regarding a complainant whose full job duties had not been restored following FMLA leave. **(Norwood email re revised recommendations (May 29, 2025) in Plaintiff's possession.)**

**88.** Despite the findings being ready for release since December 20, 2024, DeVries withheld publication for over five months. On May 30, 2025, General Counsel David Whitcomb proposed further delay, stating concern that the report would be sent 'when both her supervisor and supervisor's supervisor are not around to answer any questions she may have' before she decided whether to appeal. CHRO Salters responded, 'I agree.' Plaintiff objected in writing the same day, stating that 'the delay since then has been entirely internal to EORC' and had 'disproportionately benefited [Supervisor B] while disadvantaging every other party involved,' and that one complainant's ADA transfer request, together with related FMLA concerns, had remained unresolved since the investigation began in April 2024. **(Email chain re Appeal possibilities (May 29-30, 2025) in Plaintiff's possession.)**

**89.** The Provost Noel Wilkin later overturned Plaintiff's termination recommendation, opting to reassign Supervisor B instead, **which is admitted in October 23, 2025 Summary of Findings, Allegation 16.**

**90.** A third matter reinforced the same pattern. In March 2025, Plaintiff was assigned to investigate a senior administrator ('Respondent C'). Respondent and DeVries's relationship predated UM: Respondent C and DeVries previously worked together at another university,

where Respondent C served in an academic-affairs role and DeVries served as a Law Fellow in the Office of General Counsel.

**91.** DeVries told Plaintiff that she had lunch with Respondent C when she applied for her position at UM and acknowledged that she had a 'close relationship' with Respondent C prior to UM and that they were 'equals now.' Despite this acknowledged relationship, DeVries proposed that she take the case to investigate Respondent C's conduct herself rather than allow a neutral investigator to handle the matter.

**92.** When Plaintiff objected, DeVries repeatedly suggested that Plaintiff might be 'vulnerable' by continuing, creating pressure that led Plaintiff to recuse herself. On March 26, 2025, Plaintiff documented her recusal in writing to a Vice Chancellor of Student Affairs, stating: 'I've observed a pattern of curated compliance in Kimberly's leadership where policies are interpreted differently, by her, depending on the respondent, their role, or the nature of the complaint.' Plaintiff further noted that DeVries 'acknowledged her personal relationship with Respondent C and declined to allow [a colleague], another neutral party, to investigate. Her words and actions did not align.' **(Norwood recusal letter (Mar. 26, 2025)(Norwood email re recusal (Mar. 26, 2025) in Plaintiff's possession.)**

**93.** The University's October 23, 2025 Summary of Findings addressed this matter as Allegation 17, characterizing DeVries as 'professionally acquainted with the respondent through committees,' and resolved it as 'not substantiated.'

**94.** A fourth matter demonstrates the same pattern through racial tokenization in case assignment. In or about 2024, DeVries assigned Plaintiff to investigate a race-discrimination complaint by a Black female staff member ('Complainant D') against a white male colleague in Human Resources ('Respondent D'). Before assigning the case, DeVries spoke directly with Complainant D by phone and with the HR representative for the department. DeVries then emailed Plaintiff her personal notes and summary from that conversation, directing Plaintiff that the case should be 'quick and efficient.' Plaintiff alleges that DeVries specifically chose Plaintiff, a Black woman, to investigate another Black woman's complaint against a white colleague, creating the appearance of racial tokenization and signaling that the outcome should align with institutional protection rather than independent fact-finding. When Plaintiff later identified a comparator concern, that HR had relied on UPD's assessment to dismiss allegations against a white employee under the same policy used to terminate Complainant D, DeVries told Plaintiff to 'be careful' and refused to investigate the inconsistency.

**95.** A fifth matter reinforces the pattern of racially disparate institutional response. In or about 2024, Plaintiff investigated a complaint by a Black female staff member ('Complainant E') who had undergone multiple rounds of chemotherapy and experienced cognitive effects affecting her communication. Complainant E and her Dean supported a job transfer as an alternative to termination. DeVries declined to pursue the transfer, expressing concern that the move could be perceived as retaliatory, but did not explore it as a disability-related accommodation and initiated no ADA consultation. Around the same time, DeVries facilitated a job transfer for a white female employee with ADA-related needs ('Comparator F') from a Dean's office into a University administrative office, placing her in a role previously held by a Black woman, at a higher salary, with a clear path to advancement. Plaintiff alleges that DeVries's decisive intervention for Comparator F and corresponding inaction for Complainant E reflects intentional race-based disparate treatment in the exercise of supervisory discretion.

**96.** Plaintiff alleges that the processes described above produced more favorable treatment for respondents in the Employee A and Supervisor B matters than the process produced when Plaintiff became the complainant. When Plaintiff became the complainant rather than the investigator, the University's process produced an October 23, 2025 Summary of Findings signed by CHRO Bradley A. Salters. The Summary of Findings addressed 18 allegations: 17 against DeVries and one (Allegation 13) against Salters himself, concerning his own delay of Plaintiff's ADA transfer request. Despite this conflict, Salters signed all 18 findings, resolving every allegation, including the one about his own conduct, as "not substantiated." As to Allegation 13 specifically, the Summary of Findings states that "*there is no evidence that your disability or protected activity caused the delay.*" The report's overall conclusion adds that "*actions taken by your supervisor were consistent with institutional procedures or supported by credible, non-retaliatory explanations,*" while acknowledging that "*your concerns reflect real and meaningful workplace challenges.*" Salters signed the transmittal: "*Sincerely, Bradley Salters, Chief Human Resources Officer.*"

**97.** In each of the five matters described above, the same institutional actors (DeVries, Whitcomb, and Salters) participated in processes that produced favorable outcomes for the respondent and unfavorable outcomes for the complainant. In the Employee A matter, DeVries directed a finding of 'Responsible' be changed to 'Not Responsible.' In Investigation Two, DeVries withheld release of a 'Responsible' finding for over five months, Whitcomb proposed further delay, and Salters approved it, before the provost overturned the termination

recommendation. When Plaintiff became the complainant, Salters, who had concurred in the delay shielding Supervisor B, signed findings exonerating both DeVries and himself. This pattern is pleaded as circumstantial evidence of intentional discrimination, pretext, and unequal treatment, not as a freestanding cause of action.

**98.** The record also reflects an institutional inconsistency concerning Salters's handling of Plaintiff's accommodation request: although Salters had tied Plaintiff's further accommodation or role transition to completion of the investigation, General Counsel later stated in an email copied to Salters that ADA accommodation and FMLA matters were separate from the discrimination investigation and did not need to await its outcome. The inconsistency is pleaded as circumstantial evidence of pretext and unequal treatment. **(April 17, 2025 Salters email chain, in Plaintiff's possession.) (Email chain re: Appeal Possibilities, June 2, 2025, in Plaintiff's possession.)**

## F. Reports of a Racially Hostile Environment

**99.** During the course of her investigative duties, Plaintiff was repeatedly subjected to racial hostility. White witnesses and respondents used the full racial slur and other racial epithets verbatim during interviews, including present-day descriptions of Black people and of characteristics that Plaintiff herself possesses. These were not historical references or quotations; they were direct, intimidating uses of racial slurs in Plaintiff's presence during official University proceedings.

**100.** In a separate interview, a white student employee ("Respondent G") stood over Plaintiff at her desk and repeatedly used the full racial slur while describing a family member's leadership role in the Ku Klux Klan, after Plaintiff called him in to discuss a report against him. Plaintiff alleges she felt physically threatened and summoned a colleague for support. **(Contemporaneous notes re Respondent G interview (2024) in Plaintiff's possession.)**

**101.** When Plaintiff reported this incident to DeVries and told her that she asked him not to say the full slur, DeVries responded, in substance, "I hope you said it nicer than that," offered no support or follow-up, and later told Plaintiff that the University's General Counsel was "big on First Amendment." When Plaintiff separately raised the recurring nature of racial hostility she experienced during interviews, DeVries responded, in substance, "this seems to happen to you a lot." Plaintiff alleges these responses reflect both DeVries's individual failure to act on notice of a hostile environment (Count III) and, as to DeVries personally, deliberate indifference to conduct she had a duty to address (Count VII).

**102.** When Plaintiff raised concerns that a respondent had violated the University's retaliation policy, DeVries replied: "we don't really have a zero tolerance. We do, but we don't." When additional employees came forward wanting to file complaints against the same respondent, DeVries accused Plaintiff of "trying to recruit complainants," stating, "this isn't a class action." Plaintiff alleges that DeVries's consistent minimization of racial hostility, her failure to act, and her attribution of the pattern to Plaintiff herself created and perpetuated a racially hostile work environment.

**103.** The racial hostility Plaintiff experienced was not limited to interview settings. Plaintiff was assigned to investigate a complaint by a Black female student against a white male student-employee ("Respondent H") who had been accused of creating a racially hostile environment in University housing. After Plaintiff found Respondent H responsible, DeVries pushed back on Plaintiff's language addressing the racial dynamics, DeVries's resistance continued until she learned that Respondent H had graduated and left the state, at which point she told Plaintiff, "That makes me feel better. It's okay to find him responsible then." Plaintiff alleges that DeVries's oversight was not based on process, consistency, or standards, but on avoiding institutional fallout when a white respondent was found responsible for racial misconduct.

**104.** In a separate matter, DeVries assigned Plaintiff to investigate a race-discrimination complaint brought by another Black woman against a Human Resources employee whom DeVries described as HR's "friend and colleague," telling Plaintiff that "EORC and HR look out for each other" and that the matter should be handled "quickly and efficiently." DeVries provided Plaintiff with her own summary notes of the complainant's account in advance. When Plaintiff later identified an apparent comparator inconsistency involving similarly situated white and Black employees under the same policy, DeVries told Plaintiff to "be careful" and declined to examine it further. Plaintiff alleges DeVries's assignment of this matter to Plaintiff, coupled with her instruction to align the outcome with "institutional protection," reflects both racial tokenization in case assignment and DeVries's personal interference with investigative independence.

**105.** In a separate incident on April 15, 2024, during her investigative duties, a white witness ("Witness I"), while looking at Plaintiff's hair, described a child's hair using the phrase "n----r hair." Plaintiff reported this incident to DeVries. DeVries took no remedial action, offered no debriefing or support, and responded with disbelief. Plaintiff alleges this incident as a direct,

race-based verbal assault occurring in the course of her employment, compounding the racial hostility alleged above.

**106.** Plaintiff alleges that the cumulative effect of these experiences, repeated exposure to racial slurs and KKK references during official proceedings, including the "n----r hair" remark directed at Plaintiff's own hair, DeVries's dismissive and blaming responses, the burden of investigating complex racial-discrimination cases while personally experiencing racial hostility without support, and DeVries's pattern of protecting white respondents from accountability, created a severe and pervasive racially hostile work environment that altered the conditions of Plaintiff's employment. Plaintiff further alleges that the University, through DeVries, had actual notice of this environment and failed to take corrective action.

**107.** On information and belief, Plaintiff was also excluded from EORC/BERT/Title VI work in a manner consistent with national-origin discrimination as alleged in Charge No. 490-2026-02296.

**108.** Plaintiff alleges that the pattern described above, the assignment of the most burdensome and racially fraught cases to Plaintiff without support, DeVries's dismissal of racial hostility directed at Plaintiff, the protection of white respondents from accountability, and the racial tokenization of Plaintiff in case assignments (see ¶94, supra) constitutes further evidence of intentional discrimination based on race and national origin, and of DeVries's personal involvement in decisions animated by racial bias, as alleged in Counts II, III, and VII.

**109.** Plaintiff's objective was simple and consistent: to keep working in another role. After reporting Benson and experiencing worsened treatment by DeVries, Plaintiff sought a practical path that would preserve her employment. She contacted Assistant Vice Chancellor Dr. Shawnboda Mead and explained that she needed another position, including through the ADA/Section 504 accommodation process, because she believed a transfer would be safer than remaining in the same reporting structure. Plaintiff was not seeking to resign; she was seeking a role in which she could continue working effectively.

**110.** On March 2025, on information and belief, University officials Noel Wilkin and Bradley Salters, the officials with actual authority to approve Plaintiff's reassignment, made the relevant decisions concerning Plaintiff's placement, communicated to Plaintiff through Dr. Shawnboda Mead, who did not have independent authority to approve the transfer herself. Wilkin and Salters, through Mead, encouraged Plaintiff to formalize reports concerning DeVries

and Benson and led Plaintiff to understand that she would be moved into another job. Plaintiff reasonably relied on that placement path. The reassignment did not occur.

## G. Disability Accommodation Request, Transfer Denial, and Physician Assessment

**111.** On or about March 20, 2025, Plaintiff submitted a written request for accommodation under the ADA / Section 504 framework. The request included: (a) interim fulltime remote work while a transfer was arranged; and (b) transfer / reassignment to comparable campus positions Plaintiff identified as available and that she could perform with or without reasonable accommodation, including essential functions of civil-rights compliance, investigation, training, and related administrative work within her qualifications as an ADA Specialist / investigator and J.D. **(March 20, 2025 written accommodation request, in Plaintiff's possession.)**

**112.** Plaintiff also pursued specific reassignment pathways in real time: (a) In or about March 2025, Plaintiff discussed a Development Officer opportunity with Dean Ethel Scurlock of the Honors College, who described Plaintiff's background as "exciting." (b) On or about April 1, 2025, and in related April 2025 communications, Plaintiff pursued a proposed administrative role reporting to Dr. Wesley Jennings, Chair of Criminal Justice and Legal Studies ("CJLS"). Dr. Shawnboda Mead responded that she would pass the information to Provost Wilkin and Salters. The role was not approved for Plaintiff.

**113. Salters's involvement and the stalled reassignment process.** After CHRO Bradley Salters became centrally involved, Plaintiff's placement and accommodation process did not produce a decision on her requested transfer or another comparable role. As alleged below, Salters delayed intake, directed the accommodation process to Benefits and Leave, and later stated that further accommodation or role transitions would be considered only after completion of an investigation the University controlled. Plaintiff will prove the sequence of Salters's involvement, communications, and decisions through University records.

**114. Contemporaneous medical notice — March 19, 2025.** On or about March 19, 2025, Dr. Nicole Turner, M.D., MPH, Staff Physician with University Employee Health Services—the University's own employee-health physician—authored a letter documenting Plaintiff's disability-related mental-health condition, the return and worsening of symptoms under increased workplace stress, severe depressive symptoms and acute psychiatric distress,

medication changes, and a medical recommendation that the University strongly consider removing Plaintiff from the stressful workplace while keeping her employed. Plaintiff provided that letter (and related medical documentation) to the University. The March 19 letter gave UM contemporaneous, institutional notice of the seriousness of Plaintiff's limitations and of a medically supported path that preserved employment rather than forcing separation. Detailed clinical content is reserved for sealed or redacted exhibit practice and discovery; the fact of notice, severity, functional limitation, and the employed-but-removed-from-stress recommendation is pleaded here. **(Turner Employee Health letter (March 19, 2025) in Plaintiff's possession.)**

**115.** Dr. Turner also authored additional supporting documentation, including an ADA letter on or about April 8, 2025, and related communications on or about April 15, 2025. **(Turner ADA letter (April 8, 2025) in Plaintiff's possession.)**

**116.** On or about March 26, 2025, following an acute panic episode after the workplace events alleged herein triggered by the Hostile environment, Plaintiff packed her belongings and immediately began working from home with permission of Dr. Shawnboda Mead, DeVries's supervisor. On or about March 26, 2025, Dr. Turner witnessed Plaintiff suffer a panic attack.

**117. March 26, 2025 acute episode — percipient witness.** The March 26, 2025 acute episode occurred on campus during a scheduled check-in, and comparator Marissa Watson personally observed the precipitating conduct and assisted Plaintiff during the episode. Watson's status as a percipient witness to the March 26 episode is pleaded to show that the University's later characterization of Watson as "too far removed" (alleged below) was pretextual, and in support of Counts I–III and VII.

**118. University-physician determination of severity.** On or about March 19, 2025, and in related contemporaneous records, Dr. Nicole Turner—a University-employed physician—documented that Plaintiff was in acute psychiatric distress and identified the University workplace as the precipitating cause of Plaintiff's worsening condition, recommending Plaintiff's removal from the stressful workplace while remaining employed. Plaintiff pleads the University's own physician's severity determination and workplace-causation assessment as evidence of the seriousness of the limitation of which the University had contemporaneous notice

(relevant to the "strong likelihood" the University disregarded under Counts V–VI), not as an independent medical-causation cause of action. Detailed clinical content is reserved for sealed or redacted exhibit practice.

**119.** On or about April 7, 2025, HR approved the first work-from-home Accommodation via ADA certification. On or about July 21–22, 2025, a second HR accommodation form extended work-from-home through approximately October 16, 2025. UM administered the remote-work arrangement through recurring HR medical-certification forms every sixty to ninety days, with limited job duties Plaintiff had not requested as her preferred accommodation. Plaintiff's requested accommodation was transfer or reassignment to a safe, comparable role; remote work was an interim measure.

**120. Recurring certification did not resolve the reassignment request.** UM required Plaintiff to re-submit and re-justify her disability accommodation on a recurring sixty-to-ninety-day cycle while continuing the interim remote-work arrangement. Plaintiff alleges that this recurring process did not evaluate or resolve her separately requested job transfer or reassignment. The University neither identified a comparable vacant position it considered, nor communicated a documented qualification, vacancy, alternative-accommodation, or undue hardship analysis for the CJLS, Honors College, or other comparable pathway.

**121. April 2, 2025 — delayed intake and separate accommodation routing.** After Plaintiff sought a meeting to discuss both her work accommodations and the investigation, Salters apologized for not responding sooner, stated that he was still developing a timeline and coordinating the process for reviewing Plaintiff's concerns, and postponed the initial meeting. Salters stated that he had assigned the Director of Benefits and Leave to work with Plaintiff on "*the accommodations piece.*" **(April 2, 2025 Salters email, in Plaintiff's possession.)**

**122. April 14, 2025 — remote work was not a complete accommodation.** On or about April 14, 2025, Plaintiff emailed Salters and expressly put the University on notice that the interim remote-work arrangement was not a complete or effective resolution of her accommodation needs. Plaintiff reported continued stress and anxiety after leaving the physical office, new medication for extreme anxiety, near-fainting after communications from DeVries, and that DeVries's conduct and control continued to affect her despite physical separation. Plaintiff expressed appreciation for interim remote work but stated that she needed to transition

into another role, specifically identifying the CJLS pathway, so that she could remain employed in a safe, comparable placement. Plaintiff thus distinguished an interim measure from the requested additional accommodation of reassignment or role transition. (**April 17, 2025 Salters email chain, in Plaintiff's possession.)**

123. **April 17, 2025 — Salters conditions further accommodation and role transition on investigation completion.** On April 17, 2025, Salters apologized for the delay in initiating the intake process and stated that Plaintiff's remote work and adjusted reporting structure addressed her "immediate needs." He then wrote: "Once the investigation has concluded, any further accommodation or role transitions will be considered." Salters noted that Plaintiff could apply for posted vacancies, but he identified no vacancy analysis, qualification review, alternative-accommodation analysis, or undue-hardship determination concerning the CJLS pathway, the Honors College pathway, or another comparable reassignment.

124. **June 2, 2025: General Counsel stated that accommodation matters need not await discrimination-investigation completion.** In the separate employment investigation, involving an ADA transfer request and FMLA-related issue, in which Plaintiff served as the assigned investigator, an EORC employment-discrimination and retaliation matter in which Plaintiff served as the assigned investigator included a complainant's ADA transfer request and FMLA-related issue. General Counsel David Whitcomb wrote to Salters, DeVries, Plaintiff, and other University officials on June 2, 2025. DeVries participated as Plaintiff's supervisor and the Assistant Vice Chancellor responsible for EORC. Whitcomb stated that he viewed *"an ADA accommodation request and FMLA issues"* as *"separate from the investigation of discrimination."* He further stated that the ADA accommodation process had been ongoing and that FMLA issues *"did not need to be held pending the outcome of the investigation."* Whitcomb copied Salters, stated that he believed Salters was aware of the relevant FMLA issue, and invited Salters's Human Resources judgment concerning timing. This contemporaneous institutional position materially conflicts with Salters's April 17, 2025, statement to Plaintiff *that "any further accommodation or role transitions"* would be considered only *"[o]nce the investigation has concluded."*

125. **Constructive denial through investigation-conditioned delay.** By expressly conditioning consideration of "any further accommodation or role transitions" on completion of a separate investigation whose timing the University controlled, after receiving the March 19

Employee Health letter, Plaintiff's March 20 written accommodation request, and Plaintiff's April 14 notice that remote work was incomplete—UM unreasonably delayed and constructively denied the transfer or reassignment accommodation Plaintiff requested. This was so even though the University's General Counsel later stated, in an email copied to Salters, that ADA-accommodation matters did not need to be held pending the discrimination investigation. Remote work was an interim measure; it was not the requested effective accommodation of removal from the stressful work environment while remaining employed.

**126.** UM did not timely assess the requested transfer / reassignment on its merits. UM conducted no documented undue-hardship analysis for denying transfer to the identified CJLS or Honors pathways (or comparable roles), identified no concrete basis why those positions or comparable roles were unavailable or why Plaintiff was unqualified, communicated no alternative effective accommodation analysis, and did not grant the requested transfer. The University's own later Summary of Findings recited that Salters conditioned Plaintiff's accommodation / transfer on an investigation, that he apologized in writing for the delay, and that no undue-hardship analysis was performed. Failure to engage in a good-faith interactive process is not pleaded as an independent freestanding claim. It is pleaded as evidence that UM failed to identify or provide a reasonable accommodation—namely transfer / reassignment and a workable interim arrangement pending that transfer—and that the resulting alternative caused identifiable harm. See, e.g., *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (interactive-process failure as evidence of failure to accommodate).

**127.** **Diffused decision-making / ineffective interactive process.** On information and belief, responsibility for evaluating Plaintiff's transfer/reassignment request was diffused and deferred among HR (including Salters and accommodation-administration personnel), Dr. Mead (to whom communications and later reporting were routed), the Provost's office, and other administrators, leaving Plaintiff without a single accountable decisionmaker who timely decided the reassignment request on its merits. Plaintiff does not allege that every communication through Dr. Mead was unlawful standing alone. Plaintiff alleges that the routing and deferral structure produced no effective reassignment decision while the University continued to treat remote-work certifications as if they answered the transfer request. On information and belief,

DeVries continued to influence Plaintiff's professional environment and assignments after the reporting change, including through shared communications and institutional channels, such that physical separation and the Mead reporting line did not end the disability-related workplace harm Plaintiff had reported.

**128. Physician assessment — leave or resignation.** In or about April 2025, Dr. Turner advised, in substance, that if Plaintiff could not safely continue day-to-day interaction with the identified supervisor, Plaintiff should consider short-term disability/medical leave or leaving employment at the University. Related communications addressed Plaintiff's declining health and the University's failure to implement the ADA letter and transfer path. Dr. Turner did not recommend campus exclusion, system lockout, evidence lockout, no-contact restrictions as discipline, loss of adjunct teaching, or indefinite separation without a return plan. Plaintiff offers that contemporaneous medical advice as evidence of the severity and practical effect of the conditions she reported—not as a freestanding legal conclusion concerning UM's motive.

**129.** In or about May 2025, Plaintiff was officially reassigned to report to Dr. Mead. Remote work alone did not address the ongoing harm; Benson remained in Plaintiff's professional space, and DeVries continued to appear in shared groups and communications.

**130. Asymmetric burden during the accommodation freeze.** While Plaintiff's requested transfer/reassignment was deferred and she was left in prolonged employment limbo, eventually losing progressive access to ordinary duties, teaching assignments, and income; the persons whose conduct she had reported and from whom she sought separation, including Benson and DeVries, retained their positions, institutional access, and authority on information presently available to Plaintiff. Plaintiff is unaware of comparable transfer freezes, systems lockouts, campus exclusions, or adjunct-income stripping imposed on Benson or DeVries during the same period. Plaintiff alleges that this differential treatment is circumstantial evidence of pretext, retaliatory motive, and failure to provide an effective accommodation. Plaintiff does not allege that any particular confidential measure was or was not imposed on Benson or DeVries. This asymmetry is pleaded as evidence of pretext, retaliatory animus, and failure to accommodate, not as a freestanding claim that any particular confidential measure was or was not imposed on others.

**H. September 10, 2025 Formal Complaint and Requested Supportive Measures**

**131.** On September 5, 2025, Plaintiff attended an intake meeting with Amanda Hanincik of GRS, acting for the University's Title IX function. On September 10, 2025, Plaintiff filed a written formal complaint under Title IX against Benson, requesting a formal investigation and live-hearing process and identifying DeVries's failure to protect as an institutional issue. **(September 10, 2025 formal Title IX complaint, in Plaintiff's possession.)**

**132.** In that same filing, Plaintiff expressly requested the following supportive measures: (a) Administrative leave with pay during the investigation; (b) No-contact orders between Plaintiff and both Billy Benson and Kimberly DeVries; (c) Removal from shared group chats and email groups where Billy or Kimberly are present; (d) Restrictions on external communications, including that only Dr. Mead be authorized to speak with prospective employers regarding Plaintiff; and (e) Access to missed opportunities denied due to the hostile environment.

**133.** Plaintiff's requested measures were non-punitive, non-disciplinary, individualized, and designed to preserve safety and access while the investigation proceeded—consistent with the University's own Title IX supportive-measure standard. Plaintiff did not request: campus ban beyond her already-remote status; University email lockout; Box / systems lockout; evidence access revocation; stripping of adjunct teaching assignments and income; or indefinite leave with no return-to-work plan.

**134.** Before and after that filing, University-contracted Title IX personnel transmitted the University's Title IX Policy to Plaintiff and directed her to its provisions, including filing, advisor rights, and supportive measures. The operative September/October 2025 policy text defines supportive measures as non-punitive and non-disciplinary and as measures designed to restore or preserve equal access. Plaintiff will identify the precise policy title, effective date, and section through the version transmitted to her and University records.

**135.** The University accepted and processed Plaintiff's complaint within the Title IX framework. On September 22, 2025, GRS issued a written Notice of Initial Assessment / Notice of Intake Assessment that expressly reviewed Plaintiff's concerns "in accordance with the University's Title IX Policy," designated Benson as Respondent, and determined that the jurisdictional elements required by the Title IX Policy were met as to Benson. The Notice concluded that the Title IX Office had authority to resolve the complaint involving Benson, that

the allegations could meet the standard of Title IX Sexual Harassment under the Title IX Policy, and that a formal investigation and adjudication process would be initiated under the Title IX Policy, with an external investigator assigned due to internal conflicts of interest. **(September 22, 2025 Notice of Initial Assessment, in Plaintiff's possession.)**

**136.** UM's election to process Plaintiff's complaint under its Title IX framework establishes that UM had actual notice of reported sex discrimination, controlled the response and supportive measures, recognized Plaintiff's protected participation in that process, and acted through that process in the manner alleged below and in Count IV.

## I. October 22, 2025, Restrictive Package — Central Adverse Action

**137.** Restrictive package. On or about October 22, 2025, UM placed Plaintiff on restrictive paid administrative leave without a defined return-to-work plan. The package imposed exclusion from campus; termination of access to University email, Box, and other systems, including systems containing evidence Plaintiff needed to pursue her claims; loss of adjunct-teaching work and its associated income; restrictions on library and dining access; and no-contact restrictions. UM imposed each of these conditions unilaterally, without Plaintiff's request and without medical justification. **(October 22, 2025 restrictive-leave package, in Plaintiff's possession.)**

**138.** Decisionmakers and maintenance. On information and belief, the October 22, 2025 restrictive package was recommended, approved, communicated, or maintained by one or more University officials or agents, including Salters, in his role as CHRO with authority over leave, personnel administration, and systems and HR access, and GRS personnel acting for the Title IX Office. Plaintiff will establish the precise recommendation, approval, communication, and maintenance chain through University records and discovery.

**139.** Salters's continued control over Plaintiff's leave and access. Salters signed the October 23, 2025 Summary of Findings the day after the restrictive package took effect and, on information and belief, participated in maintaining Plaintiff's leave and access posture thereafter. Despite Plaintiff's repeated requests for review, clarification, and a written return-to-work plan, UM never provided one — leaving Plaintiff in indefinite limbo with no defined path back to her position. Plaintiff does not presently allege that DeVries personally recommended, approved, communicated, or maintained the October 22, 2025 restrictive package, but reserves that

allegation pending discovery. Plaintiff's separate allegation that DeVries served as decisionmaker over compensation, assignment, and advancement concerns a distinct set of decisions from the restrictive leave and access package addressed in this section.

**140.** Salters manufactured restrictions Plaintiff never requested. Plaintiff requested only non-punitive administrative leave with pay as a protective measure. UM granted the leave but unilaterally layered on five separate restrictions Plaintiff did not request and that her physician never recommended: campus exclusion; termination of University email and systems access; denial of access to evidence; loss of adjunct-teaching work and income; and no defined return-to-work plan. These manufactured restrictions bear no resemblance to what Plaintiff asked for or what medical guidance supported. Plaintiff further alleges that Benson — the respondent she had reported — remained in his employment role with ordinary work access throughout this same period, underscoring the disparity between how UM treated the complainant and how it treated the accused.

**141.** The lockout served no protective purpose and was pretextual. At the time of the October 22, 2025 restrictive package, Plaintiff was working remotely from Tuscaloosa, Alabama, with access only to her own personal University Box folder — not to any sensitive University files, investigative records, or systems beyond her own materials. UM's decision to disable her University email, payroll and HR self-service systems, and other systems containing her own pay stubs, benefits information, and tax documents therefore protected nothing and no one. Because the package deprived Plaintiff of access to her own employment and financial records while leaving Benson's access undisturbed, UM's characterization of the package as a "Title IX supportive measure" is pretextual on its face: a measure with no protective function cannot be a protective measure.

**142.** Remote work was not the injury — UM's added restrictions were. Before October 22, 2025, Plaintiff had worked remotely full time since March 26, 2025, under HR-approved work-from-home certifications, without incident. Plaintiff does not allege that remote work or paid leave, standing alone, caused her harm. The injury is the package UM layered on top of leave: termination of systems access, denial of access to evidence and professional tools, loss of adjunct-teaching work and income, and the absence of any defined path to resume her duties.

UM compounded this harm by continuing to publicly list Plaintiff as active EORC staff while simultaneously denying her the access necessary to perform that very role.

**143.** UM extended the systems lockout for at least ninety-one days. On January 24, 2026, UM denied Plaintiff's request to restore access to a University email or systems account that UM had disabled in connection with the October 22, 2025 restrictive package — a lockout Plaintiff alleges had by then persisted for approximately ninety-one days. This continuing denial of access, combined with UM's persistent failure to provide any return-to-work plan, is direct evidence of retaliatory motive and pretext: a genuinely protective measure would not require indefinite extension without review.

**144.** Adjunct-income losses began before October 22 and accelerated afterward. Plaintiff alleges two related categories of lost adjunct-teaching income. First, beginning in or about May 2025 — immediately after Plaintiff requested accommodation and reported discrimination and harassment — Plaintiff began losing adjunct-teaching opportunities she had previously performed and for which she remained qualified. On information and belief, University decisions affecting Plaintiff's professional access, duties, and reputation directly contributed to these pre-October losses, and Plaintiff will identify the specific decisionmakers and assignments through discovery.

**145.** From October 22, 2025 forward, UM's campus exclusion, systems restrictions, and indefinite leave without a defined return-to-work plan affirmatively prevented Plaintiff from performing in-person and systems-dependent adjunct teaching she was otherwise qualified and expected to continue performing. On information and belief, Plaintiff's academic department confirmed her continuing eligibility to teach — UM's own restrictions, not any deficiency in Plaintiff's qualifications, are what stopped her from teaching. Plaintiff will establish the courses, academic terms, compensation, assignment process, and resulting economic loss through University records and testimony.

**146.** The package caused concrete employment harm and would deter a reasonable employee. UM characterized the October 22, 2025 package as a Title IX supportive measure, but the package caused concrete, quantifiable harm to the terms and conditions of Plaintiff's employment: loss of adjunct-teaching income, campus exclusion, loss of University email and systems access, loss of access to evidence and professional tools, and indefinite restrictive leave

without a defined return-to-work plan. Under the well-established standard governing retaliation claims, a reasonable employee in Plaintiff's position would be deterred from making or supporting a discrimination complaint by the imposition of these restrictions immediately after she requested protective measures. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (retaliation is actionable where it "well might have dissuaded a reasonable worker" from engaging in protected activity).

## J. October 23, 2025 Summary of Findings: Partiality, Allegation 13, File Denial, and Authorship Conflict

**147.** On or about October 23, 2025, UM issued a document titled "Summary of Findings" in the internal matter in which DeVries was the named respondent. Bradley A. Salters — UM's Chief Human Resources Officer, and himself a subject of the conduct addressed in Allegation 13, discussed below — signed the Summary and personally transmitted it to Plaintiff.

**148.** The Summary's asymmetric treatment of the evidence is factual, not conclusory. The Summary credited DeVries's explanations without meaningful testing while construing Plaintiff's parallel allegations narrowly and skeptically, notwithstanding that both accounts arose from the same investigation and the same underlying record. Plaintiff identifies this asymmetric treatment — not as an abstract characterization, but as a comparison capable of factual proof from the document's own text — as direct, document-based circumstantial evidence of pretext, intentional unequal treatment, and retaliation. Plaintiff does not ask this Court to review the internal investigation as a freestanding due-process claim; the Summary is pleaded solely as evidence bearing on the statutory claims below.

**149.** Allegation 13 establishes, on the University's own findings, the elements of pretext. The Summary itself acknowledges: (a) Plaintiff reported that Salters told her a transfer could not be considered until the investigation concluded; (b) Salters later apologized in writing for the resulting delay; and (c) Human Resources deferred action on Plaintiff's transfer while the investigation remained pending. Despite personally admitting each of these facts, Salters signed the same Summary resolving Allegation 13 as "not substantiated" — a finding that contradicts the document's own recitation of undisputed facts. A decisionmaker's own document admitting the underlying conduct while simultaneously clearing that same conduct is itself evidence of pretext sufficient to defeat summary judgment. See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 147 (2000) (a factfinder may infer discrimination from evidence that the employer's stated reason is unworthy of credence).

**150.** The Summary omitted a specific, recorded, contradictory statement. Plaintiff possesses a contemporaneous recording in which Benson states, in substance, that he told DeVries he believed she was treating Plaintiff unfairly relative to Plaintiff's comparators — directly contradicting Benson's later denial, during the investigation, that he ever communicated this belief to DeVries. The Summary does not address, reconcile, or acknowledge this recorded contradiction anywhere in its findings. Plaintiff pleads this specific, identifiable, and evidentiary omission — not a generalized claim of investigative inadequacy — as proof that the investigator either disregarded material contrary evidence or failed to test DeVries's account against evidence squarely available to the University. This is offered as evidence of pretext and unreliability, not as an independent claim.

**151.** UM's denial of file access prevented Plaintiff from testing the record supporting her termination-track allegations. Plaintiff repeatedly and specifically requested access to the investigative file and underlying materials directly relevant to her Title IX-related civil-rights matters. UM refused every request. Because Plaintiff was denied access to the very record UM relied upon to reach its findings, she was foreclosed from identifying contradictions, omissions, or exculpatory material — including the Benson recording described in ¶150 — before the University treated the findings as final. Plaintiff pleads this denial as evidence of retaliatory intent and pretext relevant to the statutory claims below, not as a freestanding constitutional-process claim.

**152.** These facts are pleaded as evidence of intent, not as a due-process claim. Plaintiff does not assert a freestanding property interest in a "fair" internal investigation. The named-actor conflict (¶147), the documented asymmetric fact-finding (¶148–149), the unaddressed contradictory recording (¶150), and the file denial (¶151) are pleaded as specific, individually-provable facts that, taken together, are probative of intent, retaliation, pretext, and unequal treatment under the statutory and constitutional claims pleaded below.

**153.** The Summary's authorship and Salters's signature present a structural conflict capable of proof through discovery. On information and belief, GRS prepared or materially contributed to the October 23, 2025 Summary of Findings. Salters — a subject of Allegation 13

— nevertheless signed and personally transmitted the document resolving that same allegation. This is not a generalized suspicion; it is a specific, identifiable conflict of interest: the person whose own conduct was at issue in Allegation 13 approved the finding that cleared him. Plaintiff alleges that forensic document metadata and contemporaneous communications, obtainable through discovery, will establish the document's actual drafting history, review chain, and approval sequence. Plaintiff pleads these facts as a basis for targeted discovery on the independence and reliability of the process; she does not assert a freestanding spoliation or metadata claim.

**154.** The cumulative, specific facts alleged above support an inference of pretext sufficient to survive dismissal and summary judgment. Salters's signature on a finding addressing his own conduct (¶147, ¶153); the Summary's documented, asymmetric treatment of DeVries's account against its own recited facts (¶148–149); its failure to address a specific, recorded, contradictory statement (¶150); and UM's denial of the investigative file needed to test these findings (¶151) together constitute more than a "scintilla" of evidence and, viewed in the light most favorable to Plaintiff, permit a reasonable factfinder to conclude that UM's stated reasons were pretextual and that intentional discrimination or retaliation was a motivating factor. *See Reeves*, 530 U.S. at 148; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (rejection of the employer's proffered reason permits, but does not compel, an inference of discrimination). These allegations are offered as evidence supporting the claims below, not as independent claims based on process defects alone.

## K. Appeal, OCR Notice, and Synchronized Dual Denials

**155.** On or about November 7, 2025, Plaintiff appealed the Summary of Findings (EORC/GRS track) to Provost Wilkin, identifying specific procedural and evidentiary defects, including the named-actor conflict addressed in Section J and the investigation's failure to address the Benson recording and other witness evidence. UM left this appeal unresolved for more than seventy-six days.

**156.** On or about December 19, 2025, at 12:19 p.m., Plaintiff submitted her internal Mississippi Public Records Act appeal. UM left this appeal unresolved for more than thirty-six days.

**157.** On or about January 21, 2026, OCR notified Plaintiff that an attorney had been assigned to review her OCR complaint (OCR Ref. OCREMAIL00761639N) — formal confirmation that Plaintiff's external civil-rights complaint had progressed to active legal review.

**158.** On January 23, 2026, at approximately 5:31 p.m., Plaintiff gave the University direct, written notice of that development. Plaintiff sent a written Notice of External Review to Sarah Olejniczak and copied David Whitcomb, Noel Wilkin, and Donna Wagner, stating that OCR had assigned an attorney to review her complaint. Wilkin, University counsel, and the other copied recipients thereby received actual, contemporaneous, written notice of Plaintiff's protected external civil-rights activity — notice that reached the same decisionmaker who had been sitting on both pending appeals for months. **(January 23, 2026 Notice of External Review, in Plaintiff's possession.)**

**159.** Within nineteen hours of that notice, Wilkin resolved both long-dormant appeals — denying each. Approximately eighteen and one-half hours after receiving Plaintiff's January 23 notice, Provost Wilkin transmitted two denials simultaneously: (1) denial of the seventy-six-day-dormant EORC/GRS appeal; and (2) denial of the thirty-six-day-dormant MPRA/public-records appeal. Two appeals that UM had left unresolved for months were both decided and denied within a single day of Wilkin learning that Plaintiff's external complaint now had an assigned OCR attorney. **( January 24, 2026 EORC/GRS appeal denial; January 24, 2026 MPRA appeal denial, in Plaintiff's possession.)**

**160.** The denial documents' own metadata contradicts their face dates. Both denials bear a face date of January 23, 2026 — the same day as Plaintiff's notice — but neither was transmitted until January 24, 2026, after Plaintiff's 5:31 p.m. notice. The PDF files delivered to Plaintiff reflect January 24, 2026, creation or modification timestamps approximately forty-three seconds apart, indicating the two documents were finalized essentially simultaneously, in immediate response to a single triggering event. Plaintiff will obtain the original files and underlying University records to establish the complete metadata and transmission history through discovery.

**161.** The temporal sequence, standing alone, supports an inference of retaliatory causation. Two appeals — one dormant for seventy-six days, the other for thirty-six days — were resolved and denied within nineteen hours of Wilkin's actual notice that Plaintiff's external OCR complaint had reached the attorney-assignment stage. Close temporal proximity between protected activity and adverse action is itself evidence from which a reasonable factfinder may

infer retaliatory motive. *See King v. Louisiana,* 294 Fed. App'x 77, 85 (5th Cir. 2008); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 521 (5th Cir. 2001) (temporal proximity, combined with other evidence, can establish causation for retaliation claims). The abrupt end to months of institutional inaction, occurring within hours of notice of external legal review, is not consistent with ordinary administrative processing.

**162.** Plaintiff **does not** allege as an established fact that either appeal denial was backdated; she alleges the specific, verifiable facts bearing on that question: the face dates, the transmission dates, the available PDF timestamps, the seventy-six- and thirty-six-day periods of prior inaction, and the exact timing of Wilkin's actual notice of Plaintiff's protected activity. These facts, drawn directly from the documents and their metadata, are independently sufficient to plead retaliatory causation without resolving the backdating question, and Plaintiff seeks discovery concerning the drafting, approval, creation, modification, and transmission history of both denial documents to resolve it.

**163.** On or about October 23, 2025, and again on or about January 24, 2026, Plaintiff gave notice of these concerns to IHL leadership. Plaintiff pleads those communications as further notice and as context for her external protected activity; Plaintiff **does not** assert a freestanding claim against IHL trustees in this Complaint.

## L. GRS Contract Gap, Process Stall, Witness Non-Interview, and Channeling to UM

**164.** UM's own payment records establish that Salters funded and approved the very investigation whose outcome he later signed. On information and belief, UM retained GRS to conduct the external Title IX investigation in Plaintiff's matter under a paid engagement exceeding $67,000 in public funds. Public records produced by UM on April 30, 2026 show that GRS payment routing for Plaintiff's matter included approval by Salters in his capacity as CHRO. GRS Form 13 (purchase order for $99,999) was routed through multiple University officials, including Siejakowski, Kimmons, Salters, Brown, and Sneed. Salters therefore occupied two incompatible roles in the same matter: the University official who authorized payment for the investigation into his own handling of Allegation 13, and the official who later signed the Summary clearing that same conduct as "not substantiated." Plaintiff pleads Salters's participation in the payment-approval chain for the very investigation that produced the Summary of Findings he later signed as direct, document-based evidence of his conflict of interest as to Allegation 13 and of the lack of independence of the overall process.

**165.** UM's failure to provide any return-to-work plan is a separate, concrete adverse action, not background context. Plaintiff repeatedly requested a defined return-to-work plan; UM never provided one. The absence of any defined plan, combined with continuing systems restrictions and the loss of adjunct teaching opportunities, left Plaintiff on open-ended leave without any defined path back to her duties, campus access, or teaching income. Plaintiff pleads this indefinite, undefined exclusion — imposed and never resolved despite repeated requests — as an adverse employment action supporting her claims below, distinct from and in addition to the process-integrity evidence pleaded elsewhere in this section.

**166.** Plaintiff furnished specific, identifiable witnesses to GRS, and GRS's own confirmation of receipt forecloses any claim of ignorance. On June 23, 2026, Plaintiff provided Donna Wagner of GRS with the names and contact information of two student witnesses, identified here as Student B and Student C, and requested that GRS interview them in connection with the matter it was investigating. Donna Wagner confirmed receipt of that witness information the same day, June 23, 2026. GRS's contemporaneous, written confirmation of receipt establishes that any subsequent failure to interview these witnesses cannot be attributed to lack of notice.

**167.** The exclusion of a specific, similarly-situated comparator witness on a pretextual rationale supports an inference of unequal treatment. Plaintiff previously identified Marissa Watson as a witness with relevant knowledge. UM and/or GRS declined to treat Watson as a relevant witness on the stated ground that she was too far removed from the events — despite Watson's alleged status as a member of Plaintiff's own hiring cohort, a comparator, and a percipient witness to the March 26, 2025 acute episode. The stated rationale for exclusion (temporal or subject-matter remoteness) is directly contradicted by Watson's alleged first-hand presence at the March 26, 2025 episode itself, making the stated justification for exclusion implausible on its face. Plaintiff pleads the exclusion of Watson, together with the treatment of the witnesses identified in ¶166, as circumstantial evidence of pretext and unequal treatment.

**168.** GRS's failure to confirm independent authorship of its own findings undermines the process's claimed reliability. GRS conducted its investigation for UM, and GRS's resulting work product was routed through UM officials, including Salters, who signed and transmitted the October 23, 2025 Summary of Findings. GRS did not confirm to Plaintiff that GRS itself independently reached the conclusions stated in the Summary. Plaintiff pleads these facts as evidence relevant to the independence, reliability, and institutional control of the process

underlying the claims below; Plaintiff does not assert these facts as a separate cause of action against GRS.

**169.** GRS's billing records show continued work product generated after the Summary issued, under circumstances warranting discovery. Public records produced by UM on April 30, 2026 include GRS invoice entries for a matter labeled "NN v KDV" on the October 2025 invoice, reflecting 8.30 hours billed on October 28 and 31, 2025 — five and eight days after the October 23, 2025 Summary of Findings was signed. Plaintiff does not allege the identity or meaning of "NN v KDV" as an established fact. Plaintiff pleads these specific, dated billing entries — reflecting substantial continued work after the Summary's issuance — as evidence relevant to the true scope, timing, and continuation of GRS's work beyond the document's stated completion date, and as a basis for targeted discovery into what work these entries represent.

**M. Continuing Harm**

**170.** The harm from the restrictive package alleged above (¶145) is not historical — it is ongoing as of the filing of this Complaint. The October 23, 2025 Summary of Findings remains in Plaintiff's personnel record. Plaintiff remains on restrictive paid administrative leave without a defined return-to-work plan, despite her repeated requests for one. Her campus and systems access remain restricted, and she currently reports to Dr. Shawnboda Mead rather than to DeVries or Benson. Plaintiff has consistently requested to continue working in a safe, comparable role; UM has not provided that placement.

**171.** UM restored Plaintiff's access only after she engaged federal civil-rights enforcement agencies, and the timing and duration of the restriction undermine UM's stated justification. On July 2, 2026, after Plaintiff had filed charges with the EEOC and complaints with the OCR and OFCCP, CHRO Bradley Salters restored Plaintiff's systems access by email to her personal account. Salters is the same official who signed the October 23, 2025 Summary of Findings and who participated in the accommodation delay addressed in Allegation 13. Plaintiff's systems access had been disabled for approximately 253 days. UM represented that the restriction existed solely to ensure compliance with Plaintiff's own requested Title IX supportive measures, but that rationale does not explain why systems entirely unrelated to the investigation — including adjunct-teaching platforms and payroll/benefits records — remained restricted for over nine months, well beyond any plausible investigation-related need. **( July 2, 2026 Salters email re: access restoration, in Plaintiff's possession.)**

**172.** UM's own written admission contradicts its stated justification for the restriction's scope. In a June 22, 2026 email, CHRO Salters represented that Plaintiff's EORC-related and MyOleMiss access had been disabled "to ensure compliance with the approved supportive measures" Plaintiff herself had requested. **(June 19–24, 2026 Salters/Norwood Email Chain, in Plaintiff's Possession.)** Salters's own email acknowledged that Plaintiff's adjunct-teaching and payroll/benefits access were "separate from" her EORC/ADA Specialist position and did not "involve individuals or environments connected to the pending investigation." Plaintiff pleads this internal admission — that UM's own CHRO acknowledged the disabled systems had no connection to the investigation he cited as justification — as direct, document-based evidence of pretext, not circumstantial inference.

**173.** UM's disparate treatment of a similarly-situated comparator facing serious allegations demonstrates that less restrictive alternatives were available and were withheld from Plaintiff alone. During the same period Plaintiff was on restrictive leave, a former employee was placed on paid administrative leave pending a criminal indictment retained University email access and campus access throughout that leave. UM thus maintained materially more restrictive leave conditions for a reporting party who had sought protective measures. Plaintiff was subjected to a campus ban, systems and email lockout, evidence-access restrictions, loss of adjunct-teaching access, and no defined return-to-work path, while a comparator accused of criminal conduct retained full access. This comparator evidence establishes both that less restrictive alternatives existed and that UM chose not to apply them to Plaintiff, supporting an inference of pretext, disparate treatment, and retaliatory motive.

**174.** The systems lockout caused specific, ongoing harm to Plaintiff's professional relationships with former students. From February through May 2026, multiple former students continued to contact Plaintiff seeking academic mentorship, including letters of recommendation for law school, LSAT preparation guidance, internship advice, and course-related discussions. These communications continued despite the October 22, 2025, restrictive package that cut off Plaintiff's campus and systems access. The systems lockout prevented Plaintiff from responding to these students through her University email account, causing educational and professional harm distinct from, and in addition to, her lost employment income.

**175.** UM took affirmative steps to preserve its own access to Plaintiff while making no corresponding effort to preserve her students' access to her — a disparity that itself supports an inference of retaliatory intent. On October 21, 2025, the day before the restrictive package, GRS's Title IX Coordinator Consultant emailed Plaintiff requesting a personal email address "so I can continue to communicate with you." **(October 21, 2025 Hanincik email requesting personal email address, in Plaintiff's possession.)** UM took no analogous step to ensure Plaintiff's students could continue to communicate with her. The administrative leave letter delivered to Plaintiff on October 22, 2025, did not address email forwarding, student communications, or any alternate contact arrangement. Students continued to direct course-related communications to Plaintiff's University account; lacking access and any functioning alternate channel, Plaintiff could not respond, and emails seeking academic guidance, recommendations, and course-related assistance went unread and unanswered. The lockout thus impaired Plaintiff's ability to communicate with students, address time-sensitive academic matters, protect her professional standing as an instructor, and perform her instructional responsibilities — while UM simultaneously ensured it retained its own line of communication to Plaintiff.

**176.** Plaintiff has sustained concrete economic losses beyond lost salary and adjunct-teaching income, to be proven through evidence at trial, including double-housing and relocation costs incurred while her requested accommodation and transfer remained unresolved, and costs associated with postponement of her bar-examination timeline and related character-and-fitness requirements. Plaintiff does not plead these amounts as fixed or liquidated sums.

**177.** The workplace conditions and UM's response caused documented physical and physiological effects, including acute panic episodes, stress-related weight loss, and changes in prescribed medication. Plaintiff pleads these effects as evidence of the severity of her condition, of UM's contemporaneous notice of her limitations, and of the material adversity of the employment actions alleged throughout this Complaint.

**178.** Plaintiff does not seek emotional-distress damages or punitive damages under her Title IX or Section 504 claims.

## VI. CLAIMS FOR RELIEF

*(Each Count incorporates by reference all preceding paragraphs of this Complaint as though fully set forth therein.)*

### <u>COUNT I — Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a)</u>

*(Against Defendant University of Mississippi)*

**179.** Plaintiff repeats and realleges Paragraphs 1 through 44 (Nature of Action, Jurisdiction, Parties, Administrative Exhaustion) as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 59–74 (Benson harassment and DeVries's failure to protect), 131–146 (September 2025 Title IX complaint and October 22, 2025 restrictive package), 147–163 (Summary of Findings, Allegation 13, appeal denials), and 164–178 (GRS contract gap, witness exclusion, continuing harm) as the factual basis for this Count.

**180.** Plaintiff engaged in activity protected by Title VII, including reporting sexual harassment by Benson; opposing race and sex-based disparities in pay, advancement, and assignments; reporting a racially hostile work environment; filing a formal complaint the University processed under its Title IX framework on September 10, 2025; appealing the Summary of Findings; and giving notice of, and participating in, external civil-rights review including the OCR complaint.

**181.** The University subjected Plaintiff to materially adverse actions that would dissuade a reasonable worker from making or supporting a charge of discrimination, including without limitation: the October 22, 2025 restrictive package (campus exclusion, systems/evidence lockout, loss of adjunct teaching and income, and indefinite leave with no return-to-work plan); the maintenance of that package; the denial of the investigative file; and the January 24, 2026 synchronized dual denials issued shortly after the University received actual notice of Plaintiff's OCR participation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

**182.** A causal connection exists between Plaintiff's protected activity and the adverse actions, established by, among other things, close temporal proximity (including the approximately 18.5-hour interval between the January 23, 2026 OCR notice and the January 24, 2026 dual denials, following 76 and 36 days of dormancy), the process anomalies alleged above, and the differential treatment of Plaintiff relative to the respondents she reported. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001); *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428 (5th Cir. 2021).

**183.** The University's stated rationale for its actions is further undermined by internal inconsistency in its own Summary of Findings. The Summary states that "there is no evidence that you expressed interest in these interim roles or were denied an opportunity to apply" (Allegation 6), while simultaneously acknowledging that DeVries described the same interim

appointments as "not based on merit" (¶54(c)) and that Watson and Cohen were selected "because they were already doing the job" without a competitive process (¶54(d)), the identical justification the University declined to apply to Plaintiff's simultaneous ADA Specialist role. Plaintiff further alleges that UM's retention of GRS under a paid engagement exceeding $67,000 in public funds (¶164), routed for approval through Salters, the same official who signed the Summary resolving allegations against himself (¶96) — supports an inference that the investigative process lacked independence. Plaintiff pleads these facts as additional evidence of pretext, not as a freestanding claim regarding GRS's conduct or compensation.

**184.** As a direct and proximate result, Plaintiff has suffered lost wages and benefits, lost adjunct income, reputational harm, and other damages recoverable under Title VII.

**COUNT II — Disparate Treatment Because of Race and Color in Violation of Title VII, 42 U.S.C. § 2000e-2(a)**

*(Against Defendant University of Mississippi)*

**185.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 51–58 (comparator and disparate-treatment allegations) and 51, 54 (Summary of Findings admissions) as the factual basis for this Count.

**186.** The University's disparate treatment of Plaintiff was part of a broader pattern in which women of color, including Plaintiff (Black Latina), Venezuelan-national complainant, and multiple Black American complainants, were subjected to harsher scrutiny, delayed reports, denied accommodations, and diminished advancement compared to similarly situated white employees, while white EORC investigators were promoted to supervisory and compliance-specialist positions during the same period, as alleged above (¶¶54, 94–95).

**187.** This Count is limited to race and color disparate treatment; Plaintiff's national-origin allegations are pleaded as background evidence of the disparate treatment of women of color, and her sex-based allegations are pleaded under the hostile-work-environment theory in Count III and the Title IX retaliation theory in Count IV.

**188.** Plaintiff, Watson, and Cohen began as Law Fellows in Fall 2022, held identical Juris Doctor credentials, and worked in the same EORC investigator role under DeVries as the common decisionmaker over compensation, assignment, and advancement, as alleged above (¶51). Plaintiff's contemporaneous title, "EORC/Title IX Law Fellow/Investigator," and her subsequent role as ADA Specialist/EORC Investigator, reflect that she performed Title IX, Title

VI, and ADA investigative work substantially similar in kind and complexity to the duties performed by Watson and Cohen.

**189.** The University's own October 23, 2025 Summary of Findings acknowledges that Watson and Cohen were assigned to interim leadership roles, Title IX Coordinator and Assistant Director of EORC, in December 2024 without a competitive process, that DeVries described these appointments as "not based on merit," and that Watson and Cohen were selected because they were "already doing the job." Plaintiff was also already performing the duties of the ADA Specialist role, yet was required to complete a full competitive search, including interviews and a presentation, as alleged above (¶54).

**190.** Plaintiff was not merely similarly qualified to Watson and Cohen but was, at minimum, equally qualified: Plaintiff received the University's Staff Member of the Month recognition in December 2023, was nominated for the University's "40 Under 40" and Diversity and Excellence awards, was selected as an ISOM Gender Studies Faculty Fellow with a research focus on discrimination based on gender and disability status, and was recognized by the Chancellor in a December 20, 2023 letter addressing her specifically as "Law Fellow – Title IX Investigator/Trainer, EO/RC," as alleged above (¶¶46–47). **(Award and Fellowship Records; December 20, 2023 Chancellor Letter, in Plaintiff's possession.)** This recognition establishes that Plaintiff's exclusion from advancement was not attributable to any deficiency in her performance or qualifications.

**191.** The University treated Plaintiff less favorably than Watson and Cohen with respect to pay negotiation, advancement into interim leadership roles, assignment of career-enhancing policy work, and the imposition of the October 22, 2025, restrictive package, as alleged above (¶¶51–57). Plaintiff need not show that no reasonable decisionmaker could have selected Watson or Cohen for the same interim roles Plaintiff sought; disparate-treatment liability under Title VII requires only that race, color, or national origin was a motivating factor in the less-favorable treatment, and that any resulting harm to the terms or conditions of Plaintiff's employment be more than trivial. *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024); *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc). To the extent a comparative-qualifications showing is required as one form of circumstantial evidence, Plaintiff's Staff Member of the Month recognition, ISOM Fellowship, and Chancellor's letter (¶6, above) support an inference that Plaintiff was, at a minimum, as qualified as Watson and Cohen for the roles at issue.

**192.** The University's own Summary of Findings constitutes an admission of disparate treatment. The University acknowledged that Watson and Cohen received interim leadership roles, additional titles, and stipends without a competitive process, while Plaintiff, with an identical start date and comparable qualifications, was denied advancement and required to undergo a full search, as alleged above (¶54). The University's characterization of these appointments as merely "operational" and "temporary" is contradicted by DeVries's own admission that the appointments were "not based on merit," and by the University's further acknowledgment that Watson and Cohen subsequently retained permanent positions following their interim appointments, as alleged above (¶54). The Summary's claim that Plaintiff "did not express interest" in advancement is directly contradicted by the Summary's own separate findings that Plaintiff requested a promotion plan (Allegation 5), sought ADA Coordinator duties (Allegation 10), and was told promotions were not allowed (Allegations 5, 9) — all before Watson and Cohen were promoted, as alleged above (¶54).

**193.** The University's proffered reasons are pretextual, as alleged throughout, including the one-directional invocation of "fairness to Marissa and Jordan" when denying Plaintiff's requests (¶53), the internal contradiction described in ¶183, above, and the exclusion of comparator evidence from the University's own investigation, as alleged above (¶167).

**194.** Timeliness of discrete acts. Each discrete discriminatory act identified in this Count is independently actionable only if it falls within, or is otherwise rendered timely as to, the 300-day charging period preceding EEOC Charge No. 490-2026-00516 (filed on or about April 23, 2026), or is part of a continuing pattern beginning with a timely discrete act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The October 22, 2025 restrictive package and the October 23, 2025 Summary of Findings, as alleged above (¶¶137–146, 147–154), fall within that period and anchor this Count. Earlier discrete acts, including the initial denial of salary-negotiation and advancement opportunities, are pleaded as background evidence of pattern, motive, and pretext under *Morgan* and are not independently sued upon to the extent they predate the charging period.

**195.** As a direct and proximate result, Plaintiff has suffered lost wages and benefits, denied advancement and its associated compensation increases, reputational harm, and other damages recoverable under Title VII.

**<u>COUNT III — Hostile Work Environment Because of Sex and Race, in Violation of Title VII, 42 U.S.C. § 2000e-2(a)</u>**

*(Against Defendant University of Mississippi)*

**196.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 59–74 (Benson's harassment and DeVries's failure to protect), 75–79 (racially and sex-inflected supervisory conduct, including demeanor monitoring, the lactation-space issue, and the escort directive), and 99–108 (racial epithets and hostile-environment incidents) as the factual basis for this Count.

**197.** Plaintiff was subjected to unwelcome harassment based on sex, including Benson's unwanted physical touching, unauthorized access to private photographs, and explicit sexual statements, as alleged above (¶¶59–60), and based on race, including a white witness's repeated verbatim use of a racial slur while describing a family member's leadership role in the Ku Klux Klan (¶100), a separate witness's use of a racial slur to describe a child's hair while looking at Plaintiff's own hair (¶105), and DeVries's dismissive response to both incidents (¶¶101, 105). This harassment occurred together with sex- and race-inflected supervisory conduct, including the escort-accompaniment directive imposed only on Plaintiff (¶79), the demeanor-monitoring directive conditioning Plaintiff's in-office presence on maintaining a satisfactory appearance (¶75), and DeVries's proposal to relocate Plaintiff's lactation space to a furniture-storage area accessible to male custodial staff (¶76).

**198.** The harassment was sufficiently severe or pervasive, considered in its totality and cumulative effect, to alter the terms and conditions of Plaintiff's employment and to create an objectively and subjectively hostile or abusive working environment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). The severity of the racial harassment is underscored by the direct, verbatim nature of the epithets alleged (¶¶99–100, 105), which the Fifth Circuit has recognized as among the most severe forms of workplace racial harassment. *See Woods v. Cantrell*, 29 F.4th 706, 711–12 (5th Cir. 2022) (single use of a racial epithet by a supervisor can be sufficient to support a hostile-work-environment claim); *see also* ¶106 (alleging cumulative effect of repeated slur exposure and DeVries's dismissive responses).

**199.** A basis for employer liability exists because the harassment was perpetrated or facilitated by supervisors Benson and DeVries, the University knew or should have known of the harassment through Plaintiff's direct reports to DeVries beginning in May 2024 (¶59) and through the formal complaint process, and the University failed to take prompt and appropriate remedial action. Instead, DeVries responded to Plaintiff's report of a witness's slur with "I hope you said it nicer than that" and later dismissed the recurring pattern as "this seems to happen to you a lot"

(¶101), took no remedial action or debriefing after the hair-related slur (¶105), and left Plaintiff reporting to Benson for nearly one year after her initial report (¶¶64–65). The University further delayed engagement of an outside investigator until May 2025 with no complainant contact until June 2025 (¶71), and ultimately restricted Plaintiff, the complainant, through the October 22, 2025 leave package, while Benson and DeVries, the respondents, retained ordinary campus and systems access throughout (¶¶73–74).

**200.** The component acts of the hostile environment are timely under the continuing-violation doctrine, as alleged in Paragraph 40 above, because at least one contributing act, including the October 22, 2025 restrictive package and its continued maintenance, occurred within the applicable charging period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–18 (2002).

**201.** As a direct and proximate result, Plaintiff has suffered emotional distress, exacerbation of her diagnosed disability-related mental-health condition as documented by the University's own employee-health physician (¶114), and other damages alleged herein, recoverable under Title VII.

**COUNT IV — Retaliation in Violation of Title IX, 20 U.S.C. § 1681 et seq.**

*(Against Defendant University of Mississippi — Pleaded in the Alternative to Count I)*

**202.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 131–136 (September 5, 2025 intake meeting and September 10, 2025 formal Title IX complaint and requested supportive measures) and 137–146 (October 22, 2025 restrictive package) as the factual basis for this Count. This Count is pleaded in the alternative to Count I.

**203.** To the extent any protected activity or adverse action is more properly analyzed under Title IX than Title VII, Plaintiff asserts a Title IX retaliation claim. Retaliation against a person because she has complained of sex discrimination is intentional discrimination "on the basis of sex" actionable under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).

**204.** Plaintiff engaged in protected activity by reporting the University's noncompliance with the substantive provisions of Title IX, distinct from any Title VII employment-discrimination theory. Plaintiff's Title IX complaint is not an employment-discrimination claim; it is a claim for retaliation for reporting Title IX noncompliance, which is not preempted by Title VII. *See Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.

1997). Plaintiff's protected activity under this Count includes: (a) her September 5, 2025 intake meeting with Amanda Hanincik of GRS, acting for the University's Title IX function, and her September 10, 2025 written formal complaint under Title IX against Benson, which identified DeVries's failure to protect Plaintiff as an institutional Title IX compliance issue, as alleged above (¶131); (b) her request for specific, non-punitive supportive measures under the University's own Title IX Policy, including administrative leave with pay, no-contact orders, removal from shared communications with Benson and DeVries, restrictions on external employer communications, and access to missed opportunities, as alleged above (¶132); (c) DeVries's failure to protect Plaintiff and report Benson's sexual harassment to the then-Title IX Coordinator, as alleged above (¶61); and (d) the University's failure to offer an effective, non-punitive supportive measure consistent with its own Title IX Policy standard upon notice of harassment, as alleged above (¶¶65–66, 133–134).

**205.** The Fifth Circuit holds that Title VII is the exclusive remedy for employment discrimination on the basis of sex in federally funded educational institutions. *Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995). However, the Fifth Circuit recognizes an exception: Title IX provides a private right of action for retaliation against an employee who complains about noncompliance with the substantive provisions of Title IX, where the retaliation is "solely as a consequence of complaints alleging noncompliance with the substantive provisions of title IX" and Title VII provides no remedy for that specific retaliation. *Lowrey*, 117 F.3d at 247. Plaintiff's Title IX retaliation claim falls within this exception because her protected activity included complaints about the University's noncompliance with the substantive provisions of Title IX — specifically, the failure to report to the Title IX Coordinator, the failure to offer supportive measures consistent with the University's own policy standard, and the University's overall handling of her Title IX complaint, conduct that is not cognizable under Title VII's anti-retaliation provision. *See* 42 U.S.C. § 2000e-3(a). To the extent any component of Plaintiff's protected activity is also cognizable under Title VII, Plaintiff pleads this Count in the alternative and does not seek duplicative relief.

**206.** The University, having accepted and processed Plaintiff's complaint within its own Title IX framework (¶¶135–136), retaliated against Plaintiff for the protected activity described above through the October 22, 2025 restrictive package. That package, imposed in the name of "supportive measures," exceeded and materially differed from the non-punitive measures Plaintiff actually requested (¶¶132–133), instead including campus exclusion,

termination of University email and systems access, denial of access to evidence, loss of adjunct-teaching income, and no defined return-to-work plan, as alleged above (¶¶137, 140). The University's characterization of this package as a Title IX supportive measure is pretextual, as alleged above (¶141), because the restrictions served no protective purpose as to University information while depriving Plaintiff of access to her own employment and financial records, and left Benson, the respondent, with ordinary work access throughout (¶140).

**207.** The retaliation continued through the University's maintenance of the systems lockout for approximately ninety-one days (¶143), its issuance of the one-sided October 23, 2025 Summary of Findings (¶147), and its January 24, 2026 denial of Plaintiff's request to restore her systems access, which followed the same lockout period (¶143). Each of these actions followed directly from Plaintiff's Title IX-protected reporting and supportive-measure request and would dissuade a reasonable person from reporting Title IX noncompliance. *See Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

**208.** Title IX is a Spending Clause statute. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999). The Supreme Court limits damages available under Spending Clause legislation to economic and pecuniary relief; courts apply this reasoning to Title IX by analogy. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) (emotional-distress damages unavailable); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (punitive damages unavailable). Accordingly, Plaintiff seeks under this Count only economic and pecuniary damages, including lost adjunct-teaching income as alleged above (¶¶144–145), together with declaratory and injunctive relief authorized under *Jackson*, 544 U.S. 167, and does not seek emotional-distress or punitive damages under Title IX.

## COUNT V — Failure to Accommodate in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

*(Against Defendant University of Mississippi)*

**209.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 111–130 (accommodation request, transfer denial, and physician assessment) as the factual basis for this Count.

**210.** Section 504 of the Rehabilitation Act prohibits recipients of federal financial assistance from discriminating against a qualified individual with a disability solely by reason of

disability. 29 U.S.C. § 794(a). The University is a recipient of federal financial assistance, as alleged above (¶16), and is therefore subject to Section 504.

**211.** Plaintiff was, at all relevant times, a qualified individual with a disability within the meaning of Section 504. Plaintiff's diagnosed postpartum and mental-health condition, and the acute psychiatric distress documented by the University's own employee-health physician, substantially limited one or more major life activities, as alleged above (¶75, ¶114, ¶118). Plaintiff was qualified to perform the essential functions of her position, with or without reasonable accommodation, as demonstrated by her active performance of Title IX, Title VI, and ADA investigative duties throughout the relevant period, her formal title as ADA Specialist and investigator, and the University's own acknowledgment that she was assigned complex investigations because she was good at her job, as alleged above (¶47).

**212.** On or about March 20, 2025, Plaintiff submitted a written request for accommodation under the ADA/Section 504 framework, requesting (a) interim full-time remote work while a transfer was arranged, and (b) transfer or reassignment to a comparable campus position that Plaintiff identified as available and that she could perform with or without reasonable accommodation, as alleged above (¶111). The University's own employee-health physician, Dr. Nicole Turner, had given the University contemporaneous notice on March 19, 2025 of the severity of Plaintiff's condition and recommended that the University remove Plaintiff from the stressful workplace while keeping her employed, as alleged above (¶114).

**213.** The University granted only the interim remote-work component of Plaintiff's request and did not grant, timely evaluate, or engage in the interactive process concerning the requested transfer or reassignment. On April 17, 2025, CHRO Bradley Salters expressly conditioned consideration of "any further accommodation or role transitions" on completion of a separate internal investigation whose timing the University itself controlled, as alleged above (¶123). Salters identified no vacancy analysis, qualification review, alternative-accommodation analysis, or undue-hardship determination for the CJLS or Honors College pathways Plaintiff had identified, as alleged above (¶¶112, 126).

**214.** The University's position that accommodation must await the investigation's conclusion was directly contradicted by its own General Counsel. On June 2, 2025, General Counsel David Whitcomb wrote to Salters, DeVries, and Plaintiff that ADA accommodation and FMLA matters were separate from the discrimination investigation and did not need to await its outcome, as alleged above (¶124). This contemporaneous internal contradiction is direct evidence

that Salters's investigation-conditioned delay was not required by any legitimate institutional policy or practice and supports an inference of pretext, as alleged above (¶125).

**215.** The University's own subsequent October 23, 2025 Summary of Findings admits the sequence alleged above: that Plaintiff submitted a formal accommodation request, that Salters conditioned the transfer on completion of the investigation, that Salters apologized in writing for the delay, and that no undue-hardship analysis was performed, as alleged above (¶126). This is an admission by the University's own investigative process that the accommodation process was conditioned and delayed as Plaintiff alleges.

**216.** By conditioning consideration of Plaintiff's requested transfer or reassignment on the conclusion of an investigation whose timing the University controlled, after receiving unambiguous medical notice of the severity of Plaintiff's condition and an unambiguous written accommodation request, the University unreasonably delayed and constructively denied Plaintiff a reasonable accommodation in violation of Section 504. Remote work, standing alone, was an interim measure and did not constitute the effective accommodation Plaintiff requested, as alleged above (¶¶119–120, 125).

**217.** The University's diffusion of accountability for the accommodation decision among Human Resources, Benefits and Leave, Dr. Mead, and the Provost's office, without a single accountable decisionmaker who timely resolved the reassignment request on its merits, further evidences the University's failure to engage in a good-faith interactive process, as alleged above (¶127). Plaintiff pleads this failure as evidence supporting her failure-to-accommodate claim, not as an independent freestanding cause of action. *See Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013).

**218.** Itemized bases of liability. The University's failure to accommodate is established by, among other things: (a) conditioning transfer/reassignment on the conclusion of an internal investigation the University controlled and allowed to stall, as alleged above (¶123, ¶125); (b) substituting recurring sixty-to-ninety-day leave/recertification paperwork for a merits decision on the transfer request, as alleged above (¶120); (c) failing to identify or offer any vacant, comparable position or any alternative effective accommodation, as alleged above (¶126); (d) performing no documented undue-hardship analysis, as alleged above (¶126); and (e) imposing and maintaining indefinite restrictive status — campus exclusion, systems/evidence lockout, and

loss of teaching — without any return-to-work plan, while leaving the persons Plaintiff sought separation from in place with full access, as alleged above (¶¶129–130, 137, 140).

**219.** Damages limitation. Consistent with *Cummings*, 596 U.S. 212, and *Barnes*, 536 U.S. 181, Plaintiff seeks under this Count only economic/pecuniary compensatory damages and equitable relief and does not seek emotional-distress or punitive damages under Section 504.

**220.** As a direct and proximate result of the University's failure to accommodate, Plaintiff has suffered economic loss, including lost wages and benefits and lost adjunct income, recoverable under Section 504, as alleged above (¶¶143–146, ¶118).

## <u>COUNT VI — Disability Retaliation in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 34 C.F.R. §§ 104.61, 100.7€</u>

*(Against Defendant University of Mississippi)*

**221.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 111–130 (accommodation request and transfer denial), 147–154 (Summary of Findings pretext evidence), and 155–163 (November 7, 2025 and December 19, 2025 appeals, the January 21, 2026 OCR attorney-assignment notice, Plaintiff's January 23, 2026 notice to the University, and the January 24, 2026 dual appeal denials) as the factual basis for this Count.

**222.** Element 1 — Protected activity. Plaintiff engaged in activity protected under Section 504 and its implementing regulations, including requesting reasonable accommodation and transfer/reassignment (¶111), submitting medical documentation from the University's own employee-health physician (¶114), opposing the University's failure to accommodate through her April 14, 2025 written notice (¶122) and her November 7, 2025 appeal identifying evidentiary defects in the Summary of Findings (¶155), and participating in internal and external disability-related processes, including her OCR complaint filed November 8, 2025 and her January 23, 2026 written Notice of External Review to Provost Wilkin and University counsel (¶158). Section 504 incorporates the anti-retaliation protections of 34 C.F.R. §§ 104.61 and 100.7(e).

**223.** Element 2 — Materially adverse action. The University subjected Plaintiff to materially adverse actions, including the October 22, 2025 restrictive package (¶137), the maintenance of that package and the systems/evidence lockout, including the approximately ninety-one-day account lockout (¶143), the loss of adjunct teaching and income (¶¶144–145), the

denial of a return-to-work plan (¶165), and the January 24, 2026 denial of both Plaintiff's seventy-six-day-dormant Summary-of-Findings appeal and her thirty-six-day-dormant public-records appeal (¶159).

**224.** Element 3 — Causation. A causal connection exists between Plaintiff's protected disability-related activity and the adverse actions, shown by temporal proximity, the conditioning of accommodation on a controlled investigation (¶123), and the differential treatment alleged above. That causal connection is independently and powerfully corroborated by the sequence surrounding the January 2026 appeal denials: Provost Wilkin left both appeals dormant for seventy-six and thirty-six days respectively, then denied both within approximately eighteen and one-half hours of receiving Plaintiff's January 23, 2026 written notice that OCR had assigned an attorney to actively review her complaint, with both denial documents bearing creation timestamps roughly forty-three seconds apart (¶¶158–160). Close temporal proximity between protected activity and adverse action is itself evidence from which a reasonable factfinder may infer retaliatory motive. *See King v. Louisiana*, 294 Fed. App'x 77, 85 (5th Cir. 2008); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 521 (5th Cir. 2001) (¶161).

**225.** Element 4 — Intentional discrimination. For the same reasons alleged in ¶154, the University acted with the intent required for Section 504 damages under *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567, 574–75 (5th Cir. 2002), in that it disregarded a strong likelihood that its retaliatory course of conduct would deprive Plaintiff of her federally protected rights. The cumulative facts underlying that inference include CHRO Salters's signature on a Summary of Findings resolving an allegation concerning his own conduct (¶¶147, 153), the Summary's documented asymmetric treatment of the evidence (¶¶148–149), its failure to address a specific, recorded, contradictory statement (¶150), and the University's denial of the investigative file Plaintiff needed to test those findings (¶151). *See A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025).

**226.** Damages limitation. Consistent with *Cummings*, 596 U.S. 212, and *Barnes*, 536 U.S. 181, Plaintiff seeks under this Count only economic/pecuniary compensatory damages and equitable relief and does not seek emotional-distress or punitive damages under Section 504.

**227.** As a direct and proximate result, Plaintiff has suffered economic loss, including lost adjunct-teaching income and lost wages and benefits during the continuing restrictive leave, recoverable under Section 504, as alleged above (¶¶144–145, 165).

**COUNT VII — Denial of Equal Protection in Violation of the Fourteenth Amendment, 42 U.S.C. § 1983**

*(Against Defendant Kimberly M. DeVries in Her Individual Capacity Only)*

**228.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on Paragraphs 59–68 (DeVries's personal response to Plaintiff's May 2024 report of Benson's sexual harassment) as the factual basis for this Count.

**229.** The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from intentionally discriminating against persons on the basis of race and sex. A state official sued in her individual capacity is a proper defendant for damages under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Hafer v. Melo*, 502 U.S. 21 (1991).

**230.** At all relevant times, DeVries acted under color of state law in her capacity as Assistant Vice Chancellor with supervisory authority over Plaintiff's reporting structure and safety.

**231.** DeVries personally engaged in the following specific acts, each performed by DeVries herself and not merely as a conduit for institutional process: (a) DeVries had actual knowledge, beginning in May 2024, of Plaintiff's report that her supervisor Benson had subjected her to unwelcome sexual touching, access to private photographs, and explicit sexual statements, as alleged above (¶59); (b) DeVries personally invoked comparators Watson and Cohen by name as her stated reason for declining to remove Plaintiff from Benson's supervision, stating that doing so "wouldn't be fair to them," and separately instructed Plaintiff not to report Benson to the then-Title IX Coordinator, telling Plaintiff to "think about Billy" in reference to Benson's new baby and non-working wife, as alleged above (¶61); (c) DeVries personally told Plaintiff that Benson's supervisory duties could not be removed unless Plaintiff filed a formal complaint, a position contrary to the University's own Title IX framework under which supportive measures are available upon notice regardless of whether a formal complaint is filed, as alleged above (¶¶62, 66); (d) when Plaintiff told DeVries that Benson retaliated when Plaintiff avoided him, DeVries personally minimized that report, responding in substance that this was "difficult to believe" because Benson was "very protective" of Plaintiff, as alleged above (¶64); and (e) DeVries personally left Plaintiff reporting to Benson for nearly one year after Plaintiff's report, declining to implement any non-punitive protective reassignment and instead treating any removal of Benson's supervisory authority as punitive action against him rather than protection for Plaintiff, as alleged above (¶¶63, 65).

**232.** DeVries's personal acts described in Paragraph 4 were motivated by Plaintiff's race and sex. DeVries's invocation of white comparators Watson and Cohen as the stated reason for maintaining Plaintiff under her harasser's supervision, her express refusal to remove Plaintiff from that supervision absent a formal complaint contrary to Title IX policy, and her personal minimization of Plaintiff's harassment and retaliation reports together support an inference of discriminatory purpose. This inference is reinforced by DeVries's contemporaneous, separately alleged pattern of race-based decision-making, including her stated rationale for assigning Plaintiff race-sensitive investigations "because Plaintiff was a woman of color too" (¶56) and her documented dismissiveness toward Plaintiff's later reports of racial hostility, including responding "I hope you said it nicer than that" to Plaintiff's report of a witness's use of a racial slur (¶101). Plaintiff's Equal Protection claim requires proof of discriminatory purpose. *Washington v. Davis*, 426 U.S. 229 (1976); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (discriminatory purpose requires showing the decisionmaker selected or reaffirmed a course of action at least in part "because of," not merely "in spite of," its adverse effects on an identifiable group). The facts alleged show DeVries acted because of, not merely despite, Plaintiff's race and sex.

**233.** The right at issue was clearly established at the time of DeVries's conduct. By May 2024, it was clearly established that a supervisor's personal, intentional failure to protect a subordinate employee from known sexual harassment, motivated by the subordinate's race or sex and evidenced by invocation of race- or sex-based comparator reasoning, violates the Equal Protection Clause. DeVries is therefore not entitled to qualified immunity at the pleading stage, because Plaintiff has alleged specific personal acts by DeVries — her own statements, her own decision to leave Plaintiff under Benson's supervision, and her own comparator-based rationale — not merely her supervisory position or the acts of other University officials. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (qualified immunity does not protect officials who knew or reasonably should have known their conduct violated clearly established rights); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (courts may address either qualified-immunity prong first).

**234.** DeVries's conduct was the legal and proximate cause of injury to Plaintiff, including her continued exposure to Benson's harassment for nearly a year and the resulting harm alleged herein. Because Plaintiff seeks only individual-capacity damages against DeVries, the Eleventh Amendment does not bar this Count, and Plaintiff does not seek to hold the State or any of its arms liable under this Count. *See Hafer*, 502 U.S. at 30–31; *Davis v. Passman*, 442 U.S.

228 (1979) (recognizing damages remedy against individual federal official for constitutional violation; applied here by analogy to the individual-capacity Section 1983 remedy against a state official).

**235.** DeVries's conduct was intentional and undertaken with malice or reckless or callous indifference to Plaintiff's federally protected rights, supporting an award of punitive damages against her individually. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

**236.** As a direct and proximate result, Plaintiff has suffered damages recoverable under Section 1983, including compensatory and punitive damages, and attorney's fees and costs under 42 U.S.C. § 1988.

## COUNT VIII — Prospective Injunctive and Declaratory Relief Under Ex parte Young, 42 U.S.C. § 1983

*(Against Defendants Glenn Boyce, Noel E. Wilkin, Kimberly M. DeVries, and Bradley A. Salters, in Their Official Capacities Only)*

**237.** Plaintiff repeats and realleges Paragraphs 1 through 44 as if fully set forth herein. Plaintiff further specifically relies on the Title IX retaliation allegations in Count IV, the Section 504 failure-to-accommodate and retaliation allegations in Counts V–VI, and the Equal Protection allegations in Count VII as the ongoing federal-law violations this Count seeks to remedy prospectively.

**238.** Under *Ex parte Young*, 209 U.S. 123, 155–56 (1908), a plaintiff may sue state officials in their official capacities for prospective injunctive and declaratory relief to remedy an ongoing violation of federal law, notwithstanding the Eleventh Amendment. *See Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (courts need only conduct a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"). The official-capacity Defendants named in this Count each have a direct and specific connection to the enforcement or continuation of the ongoing violations alleged: Defendant Salters, as Chief Human Resources Officer, controls Plaintiff's leave status, systems access, and personnel records, as alleged above (¶¶137–140, 143); Defendant Wilkin, as Provost, has authority over the pending appeals and academic personnel actions affecting Plaintiff, as alleged above (¶¶155–159); Defendant DeVries, as Assistant Vice Chancellor, continues to exercise authority over Plaintiff's assignment and advancement, as alleged above (¶48); and Defendant Boyce, as Chancellor, holds ultimate authority to direct corrective institutional action.

*See Ex parte Young*, 209 U.S. at 157 (official must have "some connection with the enforcement" of the challenged action).

**239.** There is an ongoing violation of federal law, not a completed past wrong for which only damages could remedy the harm. The October 23, 2025 Summary of Findings remains in Plaintiff's personnel record notwithstanding its own internal admissions of the investigation-conditioned delay, as alleged above (¶¶54, 126, 149); Plaintiff remains, as of the filing of this Complaint, on indefinite restrictive leave with no defined return-to-work plan despite her repeated requests, as alleged above (¶165); her campus, email, and systems access remains revoked, continuing well past the ninety-one-day mark first placed at issue in the January 24, 2026 denial, as alleged above (¶143); and she continues to be denied a good-faith interactive process and a merits determination of her transfer/reassignment request, as alleged above (¶¶123–124, 127). Plaintiff is, as of the filing of this Complaint, still a University employee (¶15), meaning each of these conditions is presently ongoing and not merely historical.

**240.** Plaintiff seeks prospective relief including: (a) expungement of the October 23, 2025 Summary of Findings and related adverse materials from her personnel record; (b) a neutral re-investigation or reconsideration of Allegation 13 and related findings, untainted by the named-actor adjudication and authorship conflict alleged above (¶¶147, 153); (c) restoration of campus, email, and systems access; (d) a good-faith interactive process and a timely merits determination of Plaintiff's transfer/reassignment request; and (e) a defined return-to-work plan. Each item of relief is prospective in nature, is directed at ending a continuing condition rather than compensating for a completed injury, and falls within the authority of one or more official-capacity Defendants named in this Count.

**241.** Plaintiff also seeks a declaration, pursuant to 28 U.S.C. §§ 2201–2202, that Defendants' ongoing conduct as alleged violates her rights under Title IX, Section 504, and the Equal Protection Clause, to the extent such declaration is necessary to support or clarify the prospective injunctive relief requested. Plaintiff does not seek retrospective declaratory relief as a substitute for damages, and does not seek monetary relief of any kind under this Count.

**242.** Plaintiff has no adequate remedy at law for the ongoing violations described above. Damages, even if fully recovered under Counts I through VI, would not restore Plaintiff's personnel record, her systems and campus access, or provide the defined return-to-work plan and merits-based interactive process to which she is entitled; only prospective equitable relief can remedy these continuing conditions. Plaintiff will suffer irreparable harm absent the requested relief, including

continued exclusion from her position, continued reputational harm from the uncorrected Summary of Findings, and continued uncertainty regarding her employment status.

**243.** This Court has subject-matter jurisdiction over this Count under 28 U.S.C. § 1331, and this Count is not barred by the Eleventh Amendment because it seeks only prospective relief against state officials in their official capacities for ongoing violations of federal law, consistent with *Ex parte Young* and its progeny. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974) (distinguishing permissible prospective relief from barred retroactive relief).

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

A. **Declaratory relief.** A declaration that Defendants' conduct as alleged violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and the Equal Protection Clause of the Fourteenth Amendment, as applicable to each Defendant and Count, pursuant to 28 U.S.C. §§ 2201–2202.

**B. Compensatory damages against the University on Counts I–III (Title VII).** Back pay and front pay; lost adjunct income from both Stream One and Stream Two teaching assignments; lost retirement contributions and other fringe benefits; compensatory damages for emotional distress and reputational harm; and prejudgment interest on all recoverable economic losses, in amounts to be proven at trial, subject to the statutory damages cap under 42 U.S.C. § 1981a(b)(3).

**C. Economic and equitable relief against the University on Counts IV–VI (Title IX and Section 504).** Economic and pecuniary compensatory damages only, including back pay, front pay, and lost adjunct income, together with appropriate equitable relief, in amounts to be proven at trial, consistent with the Spending Clause limitations recognized in Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212 (2022), and Barnes v. Gorman, 536 U.S. 181 (2002). Plaintiff expressly does not seek emotional-distress or punitive damages under these Counts.

**D. Damages against Defendant DeVries individually on Count VII (§ 1983 Equal Protection).** Compensatory damages, including damages for emotional distress and reputational harm, and punitive damages, in amounts to be proven at trial, together with attorney's fees and costs recoverable under 42 U.S.C. § 1988(b).

**E. Prospective injunctive and declaratory relief on Count VIII against the official-capacity Defendants.** Expungement of the October 23, 2025 Summary of Findings and related adverse materials from Plaintiff's personnel record; a neutral re-investigation or reconsideration of Allegation 13 untainted by the named-actor adjudication and authorship conflict alleged above; restoration of campus, email, and systems access; a good-faith interactive process and timely merits determination of Plaintiff's transfer/reassignment request; a defined return-to-work plan; and such further prospective relief as necessary to remedy the ongoing violations alleged, with the Court retaining jurisdiction to monitor compliance.

**F. Injunctive and declaratory relief on Count IV (Title IX retaliation).** Injunctive and declaratory relief as authorized under Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005), including an order prohibiting further retaliation against Plaintiff for engaging in protected activity under Title IX.

**G. Pre- and post-judgment interest** on all amounts awarded, as authorized by law, including under 28 U.S.C. § 1961.

**H. Costs of suit**, including reasonable expert and litigation expenses, to the extent authorized by law, including 42 U.S.C. § 1988(b) and Federal Rule of Civil Procedure 54(d).

**I. Such other** and further relief as the Court deems just and proper.

**Reservation of State-Law Claims.** Plaintiff served a Notice of Claim under the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-11, on or about May 27, 2026, and expressly reserves the right to seek leave to amend this Complaint to add claims under

the Mississippi Tort Claims Act and/or other Mississippi state-law theories after the statutory ninety-five-day pre-suit waiting period has run. Nothing in this Complaint, and nothing in this Prayer for Relief, waives, releases, or forecloses those reserved state-law rights.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted on this 27th day of July 2026.

/s/ Natalia J. Norwood

Natalia J. Norwood
*Plaintiff, Pro Se*

9401 Crete Circle
Tuscaloosa, Alabama 35406
228-280-9068
Nataliajnorwood.legal@gmail.com

## VERIFICATION

I, Natalia J. Norwood, declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Complaint and that the factual allegations therein are true and correct to the best of my knowledge, except those matters alleged on information and belief, and as to those matters, I believe them to be true.

Executed on this 27th day of July, 2026.

Natalia J. Norwood